# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
October 9, 2002 Session

## JENNIFER L. BISCAN, ET AL. v. FRANKLIN H. BROWN, ET AL.

### Appeal from the Circuit Court for Davidson County
### No. 98C-2721     Carol Soloman, Judge

---

### No. M2001-02766-COA-R3-CV - Filed December 15, 2003

---

After attending a party where alcohol was present, a minor intoxicated driver and minor guest passenger were involved in an automobile accident in which the passenger suffered serious injury. The passenger sued the driver and the adult host of the party. The jury awarded the minor guest passenger damages and allocated fault 70% to the minor intoxicated driver, 15% to the adult party host, and 15% to the minor guest passenger. The driver and the host appeal various rulings of the trial court. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed and Remanded

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and W. MICHAEL MALOAN, SP. J., joined.

Alan M. Sowell, John J. Hollins, Jr., Joseph T. Howell, Nashville, Tennessee, for the appellants, Franklin Hughes Brown, Paul N. Worley.

Philip N. Elbert, Mark P. Chalos, Nashville, Tennessee, for the appellees, Jennifer L. Biscan and Robert S. Biscan.

## OPINION

In this appeal, the defendants appeal a judgment entered after a jury verdict awarding damages to Jennifer Biscan and her father, Robert Biscan, for serious brain injuries Jennifer incurred in an automobile accident, which injuries left her permanently impaired. Jennifer, 16 at the time, was riding as a passenger in the car driven by Hughes Brown, then 17, who was intoxicated. The accident occurred after Jennifer and Hughes left a party at the home of Paul Worley, where some guests had consumed beer. It is uncontested that Hughes Brown's negligent operation of the car while intoxicated was the cause of the accident.

After a jury trial, damages of $3,954,810 were awarded to Jennifer and Mr. Biscan. The jury found Hughes Brown, Jennifer Biscan, and Mr. Worley to be negligent and also found that their negligence was the legal cause of the accident and resulting injuries. The jury assessed fault 70% to Hughes Brown, 15% to Mr. Worley, and 15% to Jennifer Biscan.[1] Both Mr. Brown and Mr. Worley appealed.

The appellants do not directly raise a question of whether the jury's verdict is supported by material evidence. Instead, they have identified a total of fifteen issues on appeal that primarily involve (1) legal questions regarding proper parties as plaintiff, defendant, and for purposes of allocating fault, (2) evidentiary rulings, and (3) jury instructions.

As general background, on October 18, 1997, Paul Worley hosted a party for his daughter Ashley's eighteenth birthday at his home. A majority of the children who attended the party were students at Ashley Worley's school, where she was a senior. People were invited to the party by word of mouth, some being personally invited by Ashley Worley. Others only heard about the party.

The Worleys did not serve alcohol or make it available at the party. Although many attendees did not drink, a number brought alcohol, primarily beer, to the party and drank it there. Mr. Worley fully expected that the minor guests would both bring and consume beer on his property. He intended that a rule he had implemented in previous parties given by his son would apply: that is, that any guest who chose to drink alcohol would be required to turn over car keys and spend the night rather than drive home.

Sometime after 11:00 p.m., Jennifer Biscan decided she wanted to leave the party. She ran into her longtime friend Hughes Brown, who had been drinking, and asked him for a ride. The two left the Worley residence together in Hughes Brown's car, and approximately one mile away, at the intersection of Sawyer Brown and Sneed Road, Hughes Brown ran into a guardrail. Mr. Brown was not seriously injured in the wreck; Jennifer, on the other hand, was severely injured. Tests taken shortly after the accident revealed Hughes Brown's blood alcohol level to be .17%.[2]

## I. Recovery Of Medical Expenses - Amendment To Add Father

The original complaint herein was filed on October 2, 1998, naming as the plaintiff Jennifer Biscan, by her next friend and natural guardian, Robert S. Biscan, and seeking damages for Jennifer's injuries. It is undisputed that Mr. Biscan did not originally sue in his individual capacity for damages he sustained as Jennifer's parent.

Twenty-two months after the complaint was filed, Mr. Worley moved for partial summary

---

[1]The jury also found that neither Mr. Brown nor Mr. Worley was guilty of such malicious, intentional, or reckless conduct so as to entitle the plaintiffs to punitive damages.

[2]Tenn. Code Ann. § 55-10-408(b) establishes a presumption that a person's driving was impaired if his or her blood alcohol level is .10% or more.

judgment as to any claim for medical expenses. He also asked the court to preclude proof of medical expenses unless Jennifer Biscan could prove she personally paid the expenses or was legally obligated to pay them. In the memorandum in support of this motion, Mr. Worley also argued that Jennifer's parents were barred from bringing a cause of action for Jennifer's medical expenses because the statute of limitations had expired.[3]

Soon thereafter and in response, Jennifer Biscan moved for leave to amend her complaint to add Mr. Biscan as a plaintiff in his individual capacity. The amendment was requested to

> avoid any potential technical pleading issue by asserting a direct claim by Plaintiff Robert S. Biscan, the father of Plaintiff Jennifer L. Biscan, to recover any medical expenses incurred as a result of the injuries to Jennifer L. Biscan that might be held not recoverable by Jennifer Biscan herself because she was a minor. . . .

The trial court denied the defendants' motion for partial summary judgment and granted the Biscan motion to amend the complaint. On appeal, Mr. Worley and Mr. Brown argue that Robert Biscan was not a plaintiff in the original complaint; that the next friend of a minor plaintiff is not a party plaintiff; and that he failed to bring a claim in his individual capacity within the one-year statute of limitations. Therefore, defendants assert, he cannot sue for or recover any damages he suffered individually as Jennifer's parent. They assert the amendment to add Mr. Biscan as a plaintiff was improperly granted. They also argue that since Mr. Biscan was not a plaintiff in his individual capacity, no damages for medical expenses were recoverable because Jennifer Biscan was not entitled to damages she did not incur. They argue she was a minor, her parents were responsible for those expenses, and she did not pay for medical expenses.

The Biscans, on the other hand, argue that Mr. Worley and Mr. Brown were given notice of the accident which is the subject of the suit, the allegations of their fault in contributing to the accident and injuries, and the fact that the lawsuit was intended to recover all elements of damages relating to the injuries Jennifer Biscan sustained. Further, Mr. Worley and Mr. Brown were provided copies of Jennifer Biscan's medical bills throughout discovery. Consequently, the Biscans assert, the amendment adding Robert Biscan as a separate party relates back to the filing of the original complaint pursuant to Tenn. R. Civ. P. 15.03 and is therefore not time barred. In the alternative, they assert that Jennifer Biscan is entitled to maintain her own action for the recovery of her medical expenses, the original complaint seeks redress for Jennifer Biscan's entire injury, and therefore, Robert Biscan has relinquished his direct cause of action to Jennifer Biscan.

If Mr. Biscan was properly added as a plaintiff in his individual capacity and that amendment related back to the filing of the original complaint, then it is undisputed he could recover medical expenses attributable to Jennifer's injuries. Because we find the amendment was proper, that determination is dispositive of the question, and there is no need to examine the other issues raised.

---

[3]All the other defendants filed a motion for partial summary judgment as to medical expenses and adopted the arguments and pleadings filed by Mr. Worley on this issue.

The questions about the amendment to add Mr. Biscan as a plaintiff are governed by Rule 15.03 of the Tennessee Rules of Civil Procedure. "The goal behind Rule 15, as with all the Rules of Civil Procedure, is 'to insure that cases and controversies be determined upon their merits and not upon legal technicalities or procedural niceties.'" *Doyle v. Frost*, 49 S.W.3d 853, 856 (Tenn. 2001) (quoting *Karash v. Pigott*, 530 S. W. 775, 777 (Tenn. 1975)). Thus, Tenn. R. Civ. P. 15.03 is construed liberally in order to promote the consideration of claims on their merits. *Floyd v. Rentrop*, 675 S.W.2d 165, 168 (Tenn. 1984); *Townes v. Sunbeam Oster Co., Inc.*, 50 S.W.3d 446, 451 (Tenn. Ct. App. 2001); *McCracken v. Brentwood United Methodist Church*, 958 S.W.2d 792, 797 (Tenn. Ct. App. 1997). The rule in question provides:

> Whenever the claim or defense asserted in amended pleadings arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party or the naming of the party by or against whom a claim is asserted relates back if the foregoing provision is satisfied and if, within the period provided by law for commencing an action or within 120 days after commencement of the action, the party to be brought in by amendment (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Tenn. R. Civ. P. 15.03.

The principal purpose of the Rule is "to enable a plaintiff to correct a pleading error after the statute of limitations has run if the correction will not prejudice his adversary in any way." *Doyle*, 49 S.W.3d at 856-57 (quoting *Schiavone v. Fortune*, 477 U.S. 21, 38, 106 S. Ct. 2379, 2389 (1986) (Stevens, J. dissenting)).

The Biscans' amendment herein is covered by the second sentence of Tenn. R. Civ. P. 15.03 because it adds a party by whom a claim is asserted. "Changing" a party under the rule includes adding, dropping or substituting a party. 6A CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 1498 (2d ed. 1990). When the amendment seeks to change or add a party to the lawsuit, the claim asserted by or against that new party will be considered filed on the date of the original pleading when the requirements of the rule are met. *Doyle*, 49 S.W.3d at 856.

Many cases dealing with Tenn. R. Civ. P. 15.03 address whether the amended complaint will relate back to the date of filing of the original complaint when adding a defendant to an action. In the case herein, however, the Biscans sought to add Robert Biscan as a party plaintiff. Even prior to the adoption of Rule 15, Tennessee law allowed an amendment that added a new plaintiff to relate back to the filing of the original suit without it being barred by a statute of limitations. *See* Advisory Commission Cmt. to Tenn. R. Civ. P. 15.03. The rule did not change that principle. "[A] plaintiff may usually amend, under the relation back provision . . . to substitute or add as plaintiff the real

4

party in interest." *Braswell v. Carothers*, 863 S.W.2d 722, 726 (Tenn. Ct. App. 1993) (quoting *Osborne Enters., Inc. v. City of Chattanooga*, 561 S.W.2d 160, 163 (Tenn. Ct. App. 1977)).

In cases seeking to add a new party plaintiff after the expiration of the statute of limitations, the test is "(1) whether the defendant received adequate notice of the claim against him; (2) whether the relation back of such amendment would unfairly prejudice the defendant; and (3) whether there is an 'identity of interest' between the original party plaintiff and the new party plaintiff." *Osborne*, 561 S.W.2d at 164.

The essential requirement is that the defendant not only have notice about the operational facts but also "must have had fair notice that a legal claim existed in, and was in effect being asserted by" the plaintiff belatedly brought in. *Braswell*, 863 S.W.2d at 726. The existence of fair notice from the original complaint that the newly-added plaintiff's claim is involved ensures that the defendants suffer no prejudice from the amendment. *Id*. at 727. Prejudice is the key consideration.

The requirements of Tenn. R. Civ. P. 15.03 were met herein. The amendment clearly arises out of the same conduct and occurrence as the original complaint. The original complaint put Mr. Worley and Mr. Brown on notice of the allegations against them. It sought damages for all injuries to Jennifer resulting from the accident. They also had notice that medical expenses resulted from Jennifer's injuries, that Jennifer was a minor, and that her father was acting as her next friend and natural guardian. Mr. Worley and Mr. Brown were not prejudiced in their defense by the delayed addition of Mr. Biscan in his individual capacity and have not alleged any specific prejudice.

Consequently, we affirm the trial court's grant of the Biscans' motion to amend to add Mr. Biscan as a plaintiff in his individual capacity and the amendment's relation back to the filing of the original complaint.

## II. Dana Biscan's Role

Prior to the Ashley Worley party, a few of the minors involved, including Jennifer Biscan, Hughes Brown, and Dana Biscan, Jennifer's twin sister, gathered at the home of another friend to watch a football game. Dana, Hughes, and another friend left to purchase beer. Dana Biscan purchased several twelve packs of beer for "everyone," including Hughes Brown. Hughes drank two beers that he had in his car while driving to the Worley party. After arriving at the party, he got a twelve-pack of beer from Dana.[4]

Pursuant to Tenn. R. Civ. P. 8.03, in his answer to the original complaint, Hughes Brown identified Dana Biscan as a nonparty who should bear fault, or to whom some fault should be

---

[4]The Biscans assert that the proof showed that Hughes Brown primarily drank beer he already had, such that his intoxication could not be attributed to the beer purchased for him by Dana Biscan and, consequently, there was no showing that Dana's providing him the beer was a cause of the accident. Because the jury was not allowed to allocate any fault to Dana Biscan, we cannot presume what its conclusion might have been regarding the source of the beer.

allocated, because of her conduct in providing beer to other minors including himself.[5] Subsequently, the plaintiffs filed a motion for judgment on the pleadings or partial summary judgment asking, in part, that the court preclude any apportionment of fault to Dana Biscan. That motion was apparently not ruled on until it was raised in the telephone conference shortly before the start of the trial. An order reflecting that conference call, but entered after the trial had begun, stated, "the parties shall be permitted to assign comparative fault on Dana Biscan." However, the issue was also raised by motions for directed verdict after the close of plaintiffs' proof and after the close of all the proof, and the trial court refused to allow the jury to allocate any fault to Dana Biscan.

On appeal, Mr. Brown and Mr. Worley assert the ruling of the trial court refusing to allow the jury to allocate fault to Dana Biscan was erroneous. They also assert the trial court improperly excluded evidence regarding her possession of false identification.

## A. Fault Attributed to Dana Biscan Under Negligence Theory

In order to limit their potential liability under comparative fault principles, the defendants had indicated that Dana Biscan should be included in those parties to whom some fault should be allocated. *See Ridings v. The Ralph M. Parsons Co.*, 914 S.W.2d 79, 83-84 (Tenn. 1996). The Biscans sought a ruling precluding the allocation of any fault to Dana Biscan on the basis that the Dram Shop Act, Tenn. Code Ann. §§ 57-10-101 & -102, cuts off civil liability for the mere furnishing of alcohol to someone who then causes injury to a third person. The trial court predicated its ruling on those statutes and found that the jury could not apportion fault to Dana Biscan. The court explained to the jury:

> After reviewing the law very carefully, these lawyers have argued very capably, I have granted a directed verdict on one portion of this trial, which means you are not to consider Dana Biscan in any way at fault for providing beer. The law is clear that that's the intent of the law and so this Court must enforce that intent.

The defendants assert that the Dram Shop Act has no application to someone who does not sell alcohol. Because Dana Biscan is not a seller of alcohol and did not sell the beer in question to Hughes Brown, but instead purchased it for him and others, the defendants assert she is not entitled to the limitation on liability provided by the statutes. They argue she is subject to liability for her actions on the basis of negligence and, because she violated various statutes prohibiting the purchase, possession, and consumption of alcoholic beverages by a minor,[6] as well as statutes prohibiting the

---

[5]The Biscans then filed a separate lawsuit against Dana Biscan, the convenience store where she purchased the beer, and the business located in Nashville where she purchased her fake identification. Prior to the trial at issue herein, however, the Biscans non-suited that lawsuit. In the case before us, the Biscans also filed a motion *in limine* seeking to exclude evidence of the lawsuit against Dana. The trial court granted that motion, and the defendants also appeal that decision. We agree with the trial court on that issue since the court properly ruled that no fault could be attributed to Dana Biscan.

[6]They cite Tenn. Code Ann. §§ 1-3-113(b), 57-5-301(b)(I)(3), and 57-4-203(e)(2)(A) and (B).

furnishing of alcoholic beverages to a minor,[7] she is also guilty of negligence *per se*.  They contend her providing beer to Hughes Brown before the party was a substantial factor contributing to the injuries Jennifer received.

The Tennessee Dram Shop Act is comprised of two separate sections, and the first, Tenn. Code Ann. § 57-10-101, provides:

> The general assembly hereby finds and declares that the **consumption** of any alcoholic beverage or beer rather than the **furnishing** of any alcoholic beverage or beer is the proximate cause of injuries inflicted upon another by an intoxicated person. (emphasis added.)

As is clear from the language, the statute does not refer to selling alcohol.  Instead, it provides that the furnishing of alcohol or beer is not the proximate cause of injuries caused by someone who consumed the alcohol.  Thus, where it applies, the statute removes, as a matter of law, the required element of legal causation.

To establish a negligence cause of action, a plaintiff must show (1) a duty of care owed by the defendant to the plaintiff, (2) conduct by the defendant breaching that duty, (3) an injury or loss to the plaintiff, (4) causation in fact, and (5) proximate or legal cause. *McCall v. Wilder,* 913 S.W.2d 150, 153 (Tenn. 1995).  The concept of legal cause, formerly known as proximate cause, connotes a policy decision to establish a boundary of legal liability and to deny liability for conduct that would otherwise be actionable or result in liability.  *Waste Management, Inc. v. South Central Bell Telephone Co.*, 15 S.W.3d 425, 430 (Tenn. Ct. App. 1997).  Our Supreme Court has explained:

> . . . proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established.  Proximate or legal cause is a policy decision made by the legislature or the courts to deny liability for otherwise actionable conduct based on considerations of logic, common sense, policy, precedent and "our more or less inadequately expressed ideas of what justice demands or of what is administratively possible and convenient."

*White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998) (quoting *Snyder v. LTG. Lufttechnische GmbH*, 955 S.W.2d 252, 256 n. 6 (Tenn. 1997) (citations omitted)).

With the adoption of Tenn. Code Ann. § 57-10-101, the General Assembly has made the policy decision that the mere furnishing of alcohol cannot be the legal cause of injuries resulting from the actions of a person who consumed that alcohol.  It is true that the legislature created, in the second section of the Dram Shop Act, an exception to the general immunity from liability for furnishing alcohol, but that exception is applicable only to sellers of alcoholic beverages and only

---

[7]Tenn. Code Ann. § 35-15-404(2) and § 57-3-412(a)(4).

in specified circumstances. Tenn. Code Ann. § 57-10-102.[8] In fact, this court has found that a requirement for any liability under the statutory exception in Tenn. Code Ann. § 57-10-102 is a sale. *LaRue v. 1817 Lake Inc.*, 966 S.W.2d 423, 426 (Tenn. Ct. App. 1997); *see also Worley v. Weigels, Inc.*, 919 S.W.2d 589, 593 (Tenn. 1996) (holding that the exception only applies where there is a sale and that the injuries must be caused by the purchaser's consumption). It is undisputed that Dana Biscan is not a seller of alcoholic beverages and did not sell the beer in question to Hughes Brown. Thus, we agree with both sides that Tenn. Code Ann. § 57-10-102 does not apply to Dana or her conduct herein. The consequence, however, is that the statutory exception that allows the imposition of liability does not apply to her.

The defendants argue, however, that the provisions of Tenn. Code Ann. § 57-10-101 are likewise inapplicable to Dana because she is not a seller of alcoholic beverages and not a "dram shop" defendant. On appeal, Mr. Brown and Mr. Worley argue that the trial court improperly expanded the scope of Tenn. Code Ann. §§ 57-10-101 & -102 to encompass an individual who was clearly not a dram shop defendant, because the Act was created with the legislative intent of protecting sellers of intoxicating beverages from liability, not purchasers. Indeed, our Supreme Court has found that the legislature's intent was to change the common law rule regarding liability of sellers of alcohol and to protect sellers from liability except in very distinct circumstances. *Worley*, 919 S.W.2d at 592.

Prior to the enactment of the statutes at issue, the liability of a seller of alcoholic beverages to another for injuries caused by that other's intoxication was governed by common law principles, and courts generally recognized that "the furnishing of intoxicants may be the proximate cause of an injury resulting from intoxication, the negligence consisting of the creation of a situation or condition which involves unreasonable risk because of the foreseeable action of another."[9] *Brookins v. The Round Table*, 624 S.W.2d 547, 549 (Tenn. 1981). The rule of foreseeability stated in

---

[8]Tenn. Code Ann. § 57-10-102, entitled "standard of proof" provides that:

Notwithstanding the provisions of § 57-10-101, no judge or jury may pronounce a judgment awarding damages to or on behalf of any party who has suffered personal injury or death against any person who has sold any alcoholic beverage or beer, unless such jury of twelve (12) persons has first ascertained beyond a reasonable doubt that the sale by such person of the alcoholic beverage or beer was the proximate cause of the personal injury or death sustained and that such person:

(1) Sold the alcoholic beverage or beer to a person known to be under the age of twenty-one (21) years and such person caused the personal injury or death as the direct result of the consumption of the alcoholic beverage or beer so sold; or
(2) Sold the alcoholic beverage or beer to an obviously intoxicated person and such person caused the personal injury or death as the direct result of the consumption of the alcoholic beverage or beer so sold.

[9]Although the Court used the phrase "furnishing of intoxicants" in this one instance in *Brookins*, the case involved the illegal sale of alcohol to minors, and it is clear from the opinion in its entirety that the Court's statement of the law referred to sellers of alcohol, not those who provide it in a social setting.

*Brookins* was replaced by Tenn. Code Ann. §§ 57-10-101 and -102. *Worley*, 919 S.W.2d at 592. Thus, the statutes in question provided protection from liability to sellers that did not exist before their passage.

However, prior to the enactment of the statutes in question, under common law principles, those who provided alcohol in a social setting were treated differently from sellers. Those cases generally held that there was no liability for a person who provided alcohol in a social setting.

> At common law, an individual who furnished alcohol to another was not liable for any damages resulting from the other's intoxication, even if those damages were foreseeable, in part because the other's acceptance of the intoxicants was considered an independent intervening cause, cutting off any liability. Courts of this state have modified the common law rule in the past, holding, for instance, that liability might be imposed in certain circumstances on commercial purveyors of liquor who provided it to an intoxicated customer. However, we have found no decision, and none has been cited to us, in which such liability has been imposed on those who provided intoxicating beverages in a social context, as Hardin did here, nor do we believe that we should set such a precedent. So great a departure from settled law, with its myriad implications for casual social intercourse, is better left to the legislature.

*Cecil v. Hardin*, 575 S.W.2d 268, 271 (Tenn. 1978) (citations omitted).[10]

The legislature has made no departure from the principles discussed in *Cecil*. Instead, it adopted Tenn. Code Ann. §§ 57-10-101 and -102. Nothing in the language of those statutes can be read to impose liability upon someone who merely furnishes alcohol. While the primary purpose of the enactment of the two statutes may have been to change the law to provide protection to sellers of alcohol except in specified circumstances, the legislation also codified the existing common law rule that no liability attaches to those who provide alcohol in a social setting. Indeed, Tenn. Code Ann. § 57-10-101 employed the causation analysis previously used by the courts.

Because the General Assembly has established a statutory conclusion as to causation, courts are not free to disregard this statement of public policy or to substitute our judgment for that clearly stated by the legislature. The legislature sets public policy. *VanTran v. State*, 66 S.W.3d 790, 804 (Tenn. 2001). "The determination of public policy is primarily a function of the legislature," and the judiciary may determine public policy only in the absence of legislative determination and declaration. *Taylor v. Beard*, 104 S.W.3d 507, 511 (Tenn. 2003); *Alcazar v. Hayes*, 982 S.W.2d 845, 851 (Tenn. 1998). Our role is simply to determine whether Tenn. Code Ann. § 57-10-101 applies to someone who merely provides, but does not sell, alcohol. For the reasons stated above, and based upon the authorities discussed below, we conclude it does.

---

[10]The allegations in *Cecil* included the claim that the passenger in a car that struck and killed a bicyclist was liable because he provided beer to his friend, the intoxicated driver.

In *Larue*, 966 S.W.2d 423, this court considered the two statutes in the context of liability for the death of a passenger of an intoxicated motorcycle driver who had consumed alcohol at a local restaurant and bar. The complaint alleged that the defendant bar and its employees had negligently served both the underage driver and the underage passenger. This court held that for the exception in § 57-10-102 to apply, the plaintiffs were required to prove beyond a reasonable doubt that the defendants sold an alcoholic beverage to the driver and passenger. *Id.* at 426. Because they failed to meet that burden, the directed verdict for defendants was upheld.

*Mauldin v. Gray*, No. 02A01-9208-CV-00240, 1993 WL 312686, at *3 (Tenn. Ct. App. Aug. 18, 1993) (perm. app. denied Feb. 22, 1994), involved a situation in which two high school students, after a day of drinking beer, riding around, and attending a party, were involved in an accident that resulted in serious injuries to a pedestrian. The pedestrian sued the passenger on various theories[11] and argued on appeal that a jury instruction taken essentially verbatim from Tenn. Code Ann. § 57-10-101 was an erroneous statement of the law under the facts and that the jury should also have been charged with the provisions of Tenn. Code Ann. § 57-10-102. This court held, however, that -102 did not apply to those who furnish alcohol or beer to another "as might occur in a social setting." *Id.* at *5. Thus, our courts have uniformly held that the imposition of liability under Tenn. Code Ann. §§ 57-10-101 and -102 is limited to sellers in the specified circumstances.[12]

The precise question of whether Tenn. Code Ann. § 57-10-101 applies to preclude liability to one who furnishes alcohol in a social setting has been answered even more directly in the recent case of *Downen v. Testa*, No. E2002-01320-COA-R3-CV, 2003 WL 2002411 (Tenn. Ct. App. May 1, 2003) (perm. app. granted Dec. 8, 2003). In *Downen*, a group of minors attended a party at the Testas' home following a high school graduation ceremony. After the party, Adam Downen was killed while riding with a friend who had also attended the party and who was intoxicated. The family of Adam Downen brought suit against the social hosts.

---

[11]One was that he aided and abetted his friend, the driver, in the illegal activity of driving while intoxicated. The jury returned a verdict in favor of the passenger. On appeal, the plaintiff challenged the jury instruction that "the mere furnishing of an alcoholic beverage or beer alone is insufficient to establish liability for aiding and abetting driving under the influence of an intoxicant." This court found that the instruction was taken from the *Cecil* case and was a correct statement of the law. The plaintiff also argued that *Cecil* was distinguishable because that case involved adults and the furnishing of alcohol to a minor could be considered an element of aiding an abetting. Although this court found the record before it did not establish the driver's age, it also noted that the *Cecil* case made no such distinction. *Mauldin*, 1993 WL 312686, at *3.

[12]A holding in *Worley*, 919 S.W.2d at 593, supports our conclusion. Although the Supreme Court was primarily addressing a procedural issue as to the applicability of estoppel to alternative pleadings, the Court reversed the Court of Appeals and affirmed the trial court's grant of summary judgment to defendants. In that case, the underage drinker who caused the accident was provided alcohol by another person below the legal age for purchasing and consuming alcohol, Scottie Goosey, who had actually purchased the beer. The trial court had held that Mr. Goosey did not cause the injury, but instead gave the beer to another minor who did cause the injury. Although not explicitly stating so, the Supreme Court appears to have approved the trial court's reasoning, and that interpretation would be consistent with *Worley*'s conclusion that the injuries must be caused by the purchaser's consumption.

The trial court granted summary judgment for the social hosts as to their liability for furnishing alcohol on the ground that the consumption of the alcohol and not the furnishing of the alcohol was the proximate cause of death due to the language of Tenn. Code Ann. § 57-10-101. On appeal, this court affirmed the grant of summary judgment on that issue and specifically held, "Based on the wording of the statute and the foregoing authorities, the plaintiffs' argument that the legislature intended Tenn. Code Ann. § 57-10-101 apply only to sellers of alcohol is without merit." *Downen*, 2003 WL 2002411, at *3. Tracing the legislative history of the statutes, this court found:

> The legislative history of the Act clearly shows the legislature expressed its intent to limit the exception to sales. In the State and Local Government committee meeting held on February 25, 1986, Senator Moore (sponsor of the bill) explained that he had received an opinion from the attorney general which stated that the bill would relieve host liability and place the burden on sellers. Senator Moore reiterated this in the Senate hearing held on February 27, 1986, and explained that "this was an issue for a lot of people." Senator Darnell proposed an amendment to the bill which would have, among other things, replaced the "sold" language in the exceptions with "furnished," and thus would have imposed liability on social hosts, but the amendment was voted down. There is no question that the legislature intended that social hosts would be insulated from liability.

*Id*. at *4.[13]

Taking the strongest legitimate view of the evidence in the light most favorable to the defendants, and discarding all evidence contrary to that view, *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000); *State Farm Gen. Ins. Co. v. Wood*, 1 S.W.3d 658, 662 (Tenn. Ct. App. 1999), there was no evidence of a sale by Dana Biscan, and she was only shown to have furnished the alcoholic beverages to Mr. Brown and others. There is no other allegation of negligent conduct by Dana Biscan. For example, there is no allegation she could have prevented Hughes Brown from driving or Jennifer from becoming his passenger.

Because, as a matter of law, her conduct cannot be considered a proximate cause of Jennifer's injuries, Dana Biscan cannot be held liable for those injuries in a negligence-based cause of action, and the trial court correctly concluded that the jury could not allocate fault to her. Consequently, we affirm the trial court's grant of a directed verdict in favor of the Biscans on that issue.

---

[13]In *Dowen*, the court also stated, "while this result may not be what the legislature intended with regard to a situation involving minors, this court cannot ignore the legislature's statement of public policy." The court also noted that a number of states, by statute or by court decision, had imposed social host liability when alcohol is served to a minor, but that our legislature had declined to impose liability for the furnishing of alcohol to persons under the age of twenty-one in our most recent legislative session. 2003 WL 2002411, at *4 n.2, *citing* SB/HB 1758/1916.

11

B. Dana Biscan's Liability Under the Theory of Negligence Per Se

Mr. Worley and Mr. Brown also argue that the jury should have been able to apportion fault to Dana Biscan because she was negligent *per se* in purchasing the beer and in providing it to other minors because those acts violated penal statutes. Under the doctrine of negligence *per se*, the specific conduct required by a penal statute replaces the "reasonable person under similar circumstances" standard of care generally applicable in negligence cases. *Cook v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934,937 (Tenn. 1994); *King v. Danek Med., Inc.* 37 S.W.3d 429, 460 (Tenn. Ct. App. 2000). Conduct that violates a penal statute may be rendered negligent as a matter of law. *See* RESTATEMENT (SECOND) OF TORTS § 874A cmt. e ("The common law tort of negligence is not changed, but the expression of the standard of care in certain fact situations is modified; it is changed from a general standard to a specific rule of conduct.")

However, while such conduct may establish the duty of care and breach of duty elements of a negligence action, a plaintiff must still prove the other required elements, including causation. *Brown v. Smith*, 604 S.W.2d 56, 59 (Tenn. Ct. App. 1980). Thus, even if Dana Biscan's violation of statutes regarding the purchase, possession, and consumption by a minor or the furnishing to a minor of alcoholic beverages established her negligence *per se*, she could not be liable under that doctrine unless that negligence were a legal cause of Jennifer's injuries. *Kirksey v. Overton Pub, Inc.*, 739 S.W.2d 230, 235 (Tenn. Ct. App. 1987). As explained above, by statute it is the consumption of alcohol, not the furnishing of it, that is the proximate or legal cause of the injuries, as a matter of law.

In addition, in *Worley*, our Supreme Court held that, with the enactment of Tenn. Code Ann. §§ 57-10-101 and -102, the legislature

> has made a definite distinction between the basis for civil liability and the basis for criminal liability incident to the sale of alcoholic beverages. These statutes, rather than the duties imposed by criminal statutes, determine the civil liability of the seller.

*Worley*, 919 S.W.2d at 593.

Although the Court spoke with regard to sellers of alcoholic beverages, the principle is equally applicable to those who merely furnish them, since the two statutes apply to the broad category of alcohol-related injuries. Essentially, the legislature has determined that the mere furnishing of alcohol is not to be subject to negligence liability, as is evidenced by its use of proximate causation language in Tenn. Code Ann. § 57-10-101. Whether or not violation of the penal statutes at issue establishes a duty that was breached, the legislature has determined the civil liability does not attach thereto. We affirm the trial court's determination that fault could not be attributed to Dana Biscan on the theory of negligence *per se.*

12

## C. Possession of Fake Identification by Dana Biscan

The Biscans filed a motion *in limine* seeking to prohibit any evidence from being introduced about Dana Biscan buying beer for Hughes Brown and others and using false identification to purchase that beer on the night of the party. The trial court granted this motion in part, determining that evidence could be introduced showing that Hughes Brown got beer from Dana Biscan on the night of the accident, but excluding any reference whatsoever to fake identification. The court determined that such evidence was irrelevant and prejudicial.

Generally, evidence that meets other requirements is admissible if it is relevant, Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or for other reasons. Tenn. R. Evid. 403.

"One of the trial court's essential responsibilities is to control the flow of evidence to the jury by ruling on the admissibility of evidence, controlling the order of the proof, and determining the scope of examination of the witnesses." *Overstreet v. Shoney's*, 4 S.W.3d 694, 702 (Tenn. 1999). The decision to admit or exclude evidence rests within the sound discretion of the trial court. Accordingly, trial courts are accorded a wide degree of latitude in making such determinations, and will be overturned on appeal only upon a showing of abuse of discretion. *Rothstein v. Orange Grove Center, Inc.*, 60 S.W.3d 807, 811 (Tenn. 2001); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992).

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

Out of the presence of the jury, it was established that Dana Biscan possessed false identification. Neither Dana nor anyone else could remember if she used that fake i.d. to purchase the beer in question.

We agree with the trial court's decision to exclude evidence regarding the false identification. It is simply not relevant to any determinative issue. If this lawsuit involved the potential liability of the seller of the beer, how Dana was able to buy it would be relevant to the question of the application and effect of Tenn. Code Ann. § 57-10-102(1). That is not an issue herein. The fact that Dana illegally bought beer and gave some to Hughes Brown before the party was established. The

jury was free to draw whatever inferences it wanted from that information.

The defendants assert that the exhibiting of false identification to purchase alcoholic beverages by a person under 21 is illegal pursuant to Tenn. Code Ann. § 57-3-412. Although they concede there was no evidence she actually used the false identification to purchase the beer at issue, they nonetheless assert she was guilty of negligence *per se* by violating Tenn. Code Ann. § 57-3-412 and that the jury could have inferred that violation from the evidence excluded. As explained above, whether or not Dana Biscan committed violations of penal statutes in the purchase of the beer, she cannot be held liable for Jennifer's injuries. Other than as a basis for allocating fault to Dana, the Defendants have offered no other explanation for the relevance of the evidence. Further, even if we could find some relevance to the determinative issues in the case before us, we agree with the trial court that the dangers of prejudice and jury confusion outweigh any slight probative value of the evidence.

With regard to the defendants' assertion that Dana's mere possession of a fake i.d. is probative of her credibility, the defendants have offered no example of how Dana's credibility, or lack thereof, was placed at issue regarding the facts of this case. Additionally, the jury was informed of her illegal conduct in purchasing the beer and distributing it among the other minors and could draw the same conclusions regarding her credibility from that proof as defendants assert could have been drawn from evidence she possessed false identification.

### III. Liability of Mr. Worley

In their claim against Paul Worley, the Biscans alleged that he was negligent and that his negligence was a proximate cause of Jennifer Biscan's injuries. Mr. Worley filed a motion for summary judgment arguing that the cause of action against him should be dismissed because he owed no duty to Jennifer Biscan.[14] Shortly before trial, the trial court denied the motion for summary judgment. On appeal, Mr. Worley asserts that this denial was error.

Mr. Worley's motion for summary judgment was based upon arguments that (1) Tennessee's Dram Shop Act precluded assignment to a furnisher of alcohol in a social setting of liability for injuries caused by an intoxicated person; (2) a social host who provides alcohol even to a minor cannot be liable for injuries caused by that minor's intoxication; (3) Tennessee does not recognize the social host-guest relationship as a special relationship that creates a duty on the host to control the conduct of guests to prevent them from negligent conduct; (4) although no specific Tennessee authority exists, courts in other states have declined to impose liability on social hosts who do not furnish alcohol to minors, but allow it to be consumed on their property; and (5) that there was no basis for the aider and abettor theory for attribution of negligence *per se* to Mr. Worley.

---

[14]A necessary element of any negligence cause of action is a duty of care owed by the defendant to the plaintiff. *Staples v. CBL & Assoc., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000); *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998); *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d at 894 (Tenn. 1996).

The Biscans opposed the motion on the basis Mr. Worley owed a common law duty to use reasonable care to refrain from conduct that could foreseeably injure others and that a heightened duty exists when dealing with minors. They also argued that Mr. Worley violated the statutes prohibiting contributing to the delinquency of minors, Tenn. Code Ann. § 37-1-156; that he was criminally responsible under Tenn. Code Ann. § 39-11-402 for Hughes Brown's vehicular assault because he aided Hughes Brown in the illegal consumption of alcohol by providing a place to possess and consume it; and that he participated in a conspiracy to violate the statute prohibiting minors from consuming alcohol, all allegations of negligence *per se*. The Biscans also argued that, regardless of the existence of a common law or statutory duty, Mr. Worley had voluntarily assumed duties to prevent minors who drank from driving and had breached those assumed duties. Mr. Worley's motion did not address this issue.

Summary judgments enable courts to resolve cases on dispositive legal issues. Summary judgment is appropriate when the filings supporting the motion show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). Summary judgments are proper in a case that can be resolved on the basis of legal issues alone. *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd*, 847 S.W.2d at 210; *Church v. Perales*, 39 S.W.3d 149, 156 (Tenn. Ct. App. 2000). However, summary judgment is seldom appropriate in a negligence case, *Fruge*, 952 S.W.2d at 410; *Lett v. Collier Foods, Inc.*, 60 S.W.3d 95, 98 (Tenn. Ct. App. 2001), because of the fact specific nature of such a claim. Where, however, the dispositive issue is whether the defendant owed a duty of care to the plaintiff, summary judgment may be appropriate in a negligence case. *Lett*, 60 S.W.3d at 98; *Nichols v. Atnip*, 844 S.W.2d 655, 658 (Tenn. Ct. App. 1992). That is because the existence of a duty is a question of law to be determined by the court. *Staples v. CBL & Assoc., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000); *Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998); *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998).

Nevertheless, summary judgment is not appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. Thus, a motion for summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion - that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Webber v. State Farm Mut. Auto, Ins. Co.*, 49 S.W.3d 265 (Tenn. 2001); *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001); *Goodloe v. State*, 36 S.W.3d 62, 65 (Tenn. 2001). Summary judgment should not be used to resolve disputes of fact or inferences to be drawn from the evidence. *Church*, 39 S.W.3d at 156.

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Carvell v. Bottoms*, 900 S.W.2d 23 (Tenn. 1995); *Lett*, 60 S.W.3d at 99; *Gonzales v. Alman Constr. Co.*, 857 S.W.2d 42, 44 (Tenn. Ct. App. 1993). This court's role in review of the grant of summary judgment is to review the record and determine whether the requirements of Tenn. R. Civ. P. 56 have been met. *Staples*, 15 S.W.3d at 88. We, like the trial court, must review the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, here the Biscans, afford all reasonable inferences to that party, and discard

all countervailing evidence. *Bradshaw v. Daniel*, 854 S.W.2d 865, 870 (Tenn. 1993); *Byrd*, 847 S.W.2d at 210-11.

Consequently, the question presented is whether, based upon the filings supporting the motion and response, Mr. Worley was entitled to judgment as a matter of law. More specifically, the question is whether the undisputed material facts established that Mr. Worley owed or assumed no duty of care to Jennifer Biscan.

Viewing the evidence in the required light, the material facts are as follows.[15] Mr. Worley hosted the party for his daughter Ashley's eighteenth birthday at his residence. No written invitations were sent; Ashley Worley personally invited friends. Other students heard about the party by word-of mouth. Everyone who showed up at the Worley home on the night of the party was welcomed by the Worleys.

Mr. Worley did not intend to serve any alcoholic beverages, and did not. However, he was aware that some of the minors attending the party would bring beer and drink it at the party. He expected that to occur. Mr. Worley told Ashley prior to the party that if any of the guests consumed alcoholic beverages they would not be permitted to leave the party and would be required to stay the night. He testified that this was his "rule." The deposition excerpt filed in opposition to the motion included the following:

> [A]s we talked about having a party, the topic of drinking came up. I was concerned that there would be people drinking. I knew from my past experience with my son and with - - just my general knowledge of the kids' behavior that some drank and some didn't, and so I asked - - I talked with Ashley about that, what to do, how to deal with that, and she said that, and I agreed, that really whatever my wishes might be were irrelevant, that the kids that chose to drink would find a way to do so. I was concerned about if there was drinking, you know, that there would be the drinking and driving issue. I was worried about that happening. And so based upon that conversation and based upon my past experiences with the teenagers, I decided that the best thing - - the safest thing I could do would be to ask the kids to spend the night so that whether or not they drank they would not then go off driving. So Ashley was going to invite her close friends in the senior class, and she was told to tell them to come to the party, that there would be food and soft drinks and that in no event was anyone - - that everyone was invited and encouraged to spend the night and in no event - - if anybody drank, in no event were they to leave the property.

****

That was my rule.

---

[15]Evidence at trial regarding these events cannot be considered in our review of the trial court's summary judgment decision. Because the defendants have not challenged the sufficiency of the evidence supporting the trial court's verdict, we need not set out the additional facts that may have come out at trial.

Mr. Worley did not himself notify the guests of this requirement prior to the party, but expected Ashley to. There were a number of children that attended the party, however, that were not specifically invited by Ashley. At least some apparently knew or learned about the rule. Both Biscan girls arrived intending to spend the night, and their parents were aware of those plans.

Once at the party, some of the minor guests consumed alcohol in and around a barn which contained a rec room. None of this alcohol was provided by the Worleys. Once the party was underway, Mr. Worley became aware that some of the children brought beer, as he had expected might happen.

Mr. Worley also testified in his deposition that he was the only adult on the premises; that he was in control of the premises; and that he was in charge of supervising the party. He acknowledged that he furnished a place where the guests' parents could reasonably expect there would be a reasonable adult to supervise and chaperone the party. He testified that it was his intent and that he undertook to "keep an eye on things and make sure nobody got hurt." In furtherance of that undertaking, he "just patrolled and walked around." He did not make a point of speaking to minors who were drinking to try to assess their condition and did not pick up anyone's keys to prevent them from driving until very late in the evening, around 2:00 a.m., after he was informed of the accident.

Mr. Worley spent most of his time in the house, watching TV in a central living room and later "camping out" in an easy chair in a back room. He dozed off approximately a half hour before he was awakened by sirens on the way to the accident.

A. Duty

"A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Lindsey v. Miami Dev. Co.*, 689 S.W.3d 856, 858-59 (Tenn. 1985); W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 53 (5th ed. 1984). In this context, duty is simply a legal obligation owed by a defendant to conform to a reasonable person standard of care for the protection of the plaintiff against unreasonable risks of harm. *Staples*, 15 S.W.3d at 89; *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

> The "imposition of a legal duty reflects society's contemporary policies and social requirements concerning the right of individuals and the general public to be protected from another's act or conduct." *Bradshaw v. Daniel*, 854 S.W.2d at 870. "Indeed, it has been stated that 'duty is not sancrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.'" *Id.* (quoting W. Keeton, *Prosser and Keeton on the Law of Torts* § 53 at 358 (5th ed. 1984)); *accord Craig v. A.A.R. Realty Corp.*, 576 A.2d 688, 692 (Del. Sup. 1989) (duty is "frequently an expression by the court of evolving public policy.")

17

*McClung v. Delta Square Limited Partnership*, 937 S.W.2d 891, 894-95 (Tenn. 1996).

Over the years, courts have adopted principles to define the duty or standard of care applicable to specific situations or relationships. As a general rule, all persons have a duty to use reasonable care under the circumstances to refrain from conduct that will foreseeably cause injury to others. *Doe v. Linder Constr. Co., Inc.*, 845 S.W.2d 173, 178 (Tenn. 1992). However, individuals do not ordinarily have a duty to act affirmatively to protect others from conduct other than their own. *Nichols*, 844 S.W.2d at 661. In other words, one generally does not have a duty to control the conduct of another so as to prevent that person from injuring a third party. *Messer Griesham Industries, Inc. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 599 (Tenn. Ct. App. 2001); *Lett*, 60 S.W.3d at 99-100 (Tenn. Ct. App. 2001).

Despite this general rule, such a duty may arise when a "special relation" exists between the defendant and either (1) the person whose conduct threatens to cause harm or (2) the person exposed to harm. *Bradshaw*, 854 S.W.2d at 871; *Messer Griesham*, 45 S.W.3d at 599; *Lett*, 60 S.W.3d at 99-100; *Newton v. Tinsley*, 970 S.W.2d 490, 492 (Tenn. Ct. App. 1997). By recognizing this exception, Tennessee courts have adopted the Restatement (Second) of Torts § 315, which describes the exception as arising where a special relation imposes a duty to control the third person's conduct or gives another person a right of protection. RESTATEMENT (SECOND) OF TORTS, § 315.

In subsequent sections, the Restatement lists and describes some of those special relations giving rise to the general duty set out in § 315. These include parent and minor child, employer and employee, property owner and guest. RESTATEMENT (SECOND) OF TORTS §§ 316, 317, and 318; *Lett*, 60 S.W.3d at 100. Section 318 recognizes the relationship of a possessor of land and a person using or carrying on an activity on that land with the possessor's permission as creating a duty to control the conduct of third persons to prevent foreseeable risks of harm. This duty applies where the possessor of the land is present during its use and, therefore, has the ability and opportunity to control the conduct of others on the property. RESTATEMENT (SECOND) OF TORTS § 318, cmt. b.

Tennessee courts have yet to specifically adopt Section 318. In only one case, however, has the court expressly declined to adopt it.[16] *Wilkerson v. Altizer*, 845 S.W.2d 744 (Tenn. Ct. App. 1992). In that case, this court noted that no Tennessee court has adopted the section or held that owners of premises had a duty to control the conduct of persons on their property to prevent them from acting negligently and declined to be the first to so hold. *Id.*, 845 S.W.2d at 747-48. The *Wilkerson* court also found that the adoption of Section 318 would impose a greater duty on private hosts than our Supreme Court had been willing to place on the owners of business premises, relying

---

[16]Other cases merely cite *Wilkerson* for the proposition that this state has not adopted Section 318, even where that section is not at issue in the case. *See e.g., Nichols*, 844 S.W.2d at 662; *Newton*, 970 S.W.2d at 490. Other cases list the property owner-guest relation as one included in the Restatement, without distinguishing it from the other special relations. *See, e.g., Lett*, 60 S.W.3d at 100; *Marr v. Montgomery Elevator Co.*, 922 S.W.2d 526, 529 (Tenn. Ct. App. 1996).

on *Cornprost v. Sloan*, 528 S.W.2d 188 (Tenn. 1975).[17] The Tennessee Supreme Court in *McClung*, 937 S.W.2d 891, 899 (Tenn. 1996)[18] has since overruled *Cornprost*, thus calling into question the continuing validity of *Wilkerson*.

The Tennessee Supreme Court has found that the social host-guest relationship is a special relation that creates a duty to render aid to another in peril where such duty would not otherwise exist. *Lindsey*, 689 S.W.2d at 859-60. While the duty at issue in *Lindsey* is different from the duty at issue herein and in Restatement § 315, *Lindsey* certainly stands for the proposition that a social host may have a duty to his or her guests that would not exist without that relationship.

For two reasons we do not think that the resolution of the duty issue in this case depends upon the adoption or rejection of Section 318. First, the list of recognized special relations set out in the Restatement is not an exclusive one. *Newton*, 970 S.W.2d at 493. In addition, Tennessee has adopted Section 315 of the Restatement, *Lett*, 60 S.W.3d at 99; *Newton*, 970 S.W.2d at 492, and our courts have found that a special relation to either the individual whose conduct threatens to cause harm or to the individual exposed to the harm creates an exception to the general rule that one does not have a duty to control the conduct of a third person so as to prevent that person from injuring a third party. *Messer Griesheim*, 45 S.W.3d at 599; *Newton*, 970 S.W.2d at 492. Our courts have consistently held that for a duty to arise because of a special relation the defendant must have the ability, capacity, means, or authority to control the other person. *Lett*, 60 S.W.3d at 100; *Marr v. Montgomery Elevator Co.*, 922 S.W.2d 526, 530 (Tenn. Ct. App. 1996); *Newton*, 970 S.W.2d at 493.

Mr. Worley intended to exercise exactly the control that would have prevented Hughes Brown from driving away from the party in an intoxicated state. He had, and believed he had, the ability to exercise that control and had exercised that control in the past at parties given by his son. He asserted the right to control when he imposed his "rule" that those minors who drank were to spend the night as a condition of the use of his property.

---

[17] In *Wilkerson*, the issue of the social host's duty was raised in the context of the trial court's refusal to instruct the jury on Section 318, and this court held that the trial court's refusal was not reversible error because the overall charge included language regarding a host's duty to exercise reasonable control over the conduct of his or her guests, which was substantively the same as Section 318. Thus, it is arguable that the court's refusal to adopt Section 318 was not necessary to the resolution of the case and, therefore, *dictum*.

[18] In *Cornprost*, the Supreme Court had held that businesses had no duty to protect their customers from criminal acts of third parties unless they knew or had reason to know that such acts were occurring or about to occur on the premises that posed imminent probability of harm to a customer. *Cornprost*, 528 S.W.2d at 198. In *McClung*, the Court re-examined that holding, finding that it was two decades old and rendered with little case law on the subject to guide the Court in its decision, but that numerous courts and commentators had considered the issue since *Cornprost*. The Court discarded the *Cornprost* rule in favor of the majority position, as reflected in Section 433 of the Restatement (Second) of Torts, that businesses have a duty to protect customers from foreseeable criminal acts and rejected the *Cornprost* limitation on foreseeability. *Id*. 898-99. The Court specifically held that its balancing of factors approach to a determination of the existence of a duty was to be applied.

In this context, another well-settled principle must be considered, because this was not a typical social host-guest situation, but instead involved minors. It has long been the law of this state that individuals have a heightened duty of care regarding children. *Townsley v. Yellow Cab Co.*, 145 Tenn. 91, 237 S.W. 58 (Tenn. 1922). In that case, the Supreme Court stated that persons who are chargeable with a duty of care toward children must anticipate that children will act upon childish instincts and impulses. *Id.*, 145 Tenn. at 94, 237 S.W. at 58. The level of precaution necessary for a very young child might differ from that for a teenager, *Hawkins Co. v. Davis*, 216 Tenn. 262, 391 S.W.2d 658 (Tenn. 1965), because the experience of the older child would make some conduct less foreseeable. Nonetheless, teenagers, like younger children, are often heedless of dangers or warnings and exercise less discretion in avoiding potential harm than adults. Thus, the reasonableness of conduct toward such individuals must take into consideration these foreseeable weaknesses.

Our legislature has determined that persons under the age of twenty-one are incompetent to responsibly consume alcohol. There can be no doubt that the law attempts to protect minors, as well as the general public, from the consequences of their consuming alcohol by prohibiting the possession or purchase of alcohol by minors and the sale of alcohol to minors. As our Supreme Court has stated:

> These broad prohibitions are intended not only to protect minors from the folly of their own actions, but are for the protection of members of the general public as well. They are directed to minors as a class in recognition of their susceptibilities and the intensification of dangers inherent in the consumption of alcoholic beverages, when consumed by a person lacking in maturity and responsibility.

*Brookins*, 624 S.W.2d at 550. Thus, the law recognizes both the dangers inherent in consumption of alcohol by minors and their weaknesses in judgment.

The more compelling reason why the applicability of Section 318 is not determinative is because duty is a flexible concept and dependent upon the circumstances of the situation. The Tennessee Supreme Court has in recent years consistently and repeatedly held that the proper analytical framework for determining the existence or non-existence of duty is a balancing approach based on principles of fairness and justice. *See, e.g.*, *Staples*, 15 S.W.83 at 89; *Sabir*, 979 S.W.2d at 308; *Coln*, 966 S.W.2d at 39; *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997); *McClung*, 937 S.W.2d at 901.

Because every person has a duty to act reasonably under the circumstances to protect others against unreasonable risks of harm, the purpose of the balancing is to determine whether the risk of harm to the plaintiff was unreasonable in the circumstances.

> In *McCall v. Wilder*, 913 S.W.2d 150 (Tenn. 1995), we observed that "[a] risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the

20

harm." *McCall v. Wilder*, 913 S.W.2d at 153. We have also noted that several factors are to be considered in deciding whether a risk is an unreasonable one, thereby giving rise to a duty. "Those factors include the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility or alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct." *Id.* at 153.

*McClung,* 937 S.W.2d at 901.

The question of whether Mr. Worley owed a duty to Jennifer Biscan to prevent Hughes Brown from driving in an intoxicated state after having consumed beer at the party, with or without a passenger, or to prevent Jennifer from riding in the car with Hughes Brown must be answered by balancing the degree of foreseeability of harm against the burden upon Mr. Worley to avoid the harm by acting differently. *Id*. at 901. The degree of foreseeability of harm and the magnitude of that potential harm must be balanced against the onerousness of the burden involved in alternative conduct. "Of course, a duty of care is dependent upon foreseeability." *Pittman v. Upjohn*, 890 S.W.2d 425, 431 (Tenn. 1994).

Applying the relevant factors to the circumstances presented in this case, it is clear that it was foreseeable that a minor guest who drank at the party would become intoxicated and that if an intoxicated minor drove a car, there would be an accident. The potential for resulting harm to the driver, any passengers, and other motorists was great. Regarding the possible magnitude of potential harm, the Supreme Court recently stated:

We need look no further than the all too common example of DUI-related accidents to appreciate the possible magnitude of harm or injury that can result from an impaired driver. Deaths and serious injuries tragically occur every day as the result of impaired drivers who are operating motor vehicles on our roads and highways. In addition to the devastation such accidents can wreak on individuals and families, our society also incurs substantial costs (both human and economic) as a result of impaired drivers.

*Burroughs v. Magee*, 118 S.W.3d 323, 332 (Tenn. 2003).

On the other side of the equation, the burden placed on Mr. Worley to prevent the harm caused by an intoxicated minor driver leaving Mr. Worley's home was not onerous. He himself devised a plan which merely required him to enforce the rule he attempted to impose. He only had to retrieve car keys or make the cars inaccessible. Of course, he also could have banned alcohol or refused to have the party.

21

Mr. Worley does not argue that injury to Jennifer was not foreseeable or that alternative conduct on his part would have been onerous. Instead, he relies upon generalized principles limiting social host liability, including authority from other states. We have carefully and throughly reviewed the cases relied upon by Mr. Worley as well as those argued by the Biscans. In addition, we have conducted our own research, consulting additional cases from other states and numerous law review and other articles. Suffice it to say that, while interesting and educational, that research provided little guidance for resolution of the case before us. The material reviewed compels the conclusion that Tennessee concepts of duty must be applied to the facts of this case and that our Supreme Court has told us how to apply those concepts.

Based upon our analysis of those factors, we conclude that the foreseeability and gravity of harm greatly outweighed any burden on Mr. Worley to take action to prevent the harm. In addition to the factors relevant to the balancing approach set out above, considerations of public policy are also important in determining whether a duty of care existed in a particular case. *Bain v. Wells*, 936 S.W.2d 618, 625 (Tenn. 1997); *Bradshaw*, 854 S.W.2d at 870. As our Supreme Court has stated, duty reflects society's requirements and contemporaneous public policy regarding the entitlement of individuals or the general public to protection from another's conduct. *Estate of Amos v. Vanderbilt University,* 62 S.W.3d 133, 138 (Tenn. 2001); *McClung*, 937 S.W.2d at 894. In *Nichols*, this court observed that future exceptional cases might cause inroads into the rule that a defendant owes no duty to control the conduct of another person, specifically stating, "The public's concern over the tragic epidemic of injury and death caused by drunk drivers may very well provide some of these exceptional cases." 844 S.W.2d at 662.

There can be no question that the public policy of this state is to lessen the instances of driving while intoxicated. Statutory changes regarding punishment and consequences of violating the prohibition on driving while intoxicated clearly demonstrate the seriousness of the commitment to eradicating this threat to public safety. There can also be no question that intoxicated minor drivers pose a serious threat to their own safety and that of others.[19] Our state's public policy is to eliminate this danger.

Imposing a duty to act reasonably to prevent driving by an intoxicated minor in a situation where the adult defendant has the authority and opportunity to take non-onerous action to preclude that driving furthers such public policy.[20] We find Mr. Worley owed a duty of reasonable care under the circumstances to Jennifer Biscan.

---

[19]For a thorough discussion of the statistical evidence regarding the consequences of DUI-related and underage-DUI-related incidents, *see* A. Easley, *Vendor Liability for the Sale of Alcohol to an Underage Person*, 21 CAMPB. L. REV. 277, 291-300 (1999).

[20]We recognize an apparent anomaly if an adult host who served alcohol to a minor could not be liable because of the Dram Shop Act, but a host who acted with good intentions as Mr. Worley did could face liability. We simply note that the case before us does not involve a defendant who served alcohol to minors, and we are not called upon to address that situation. Further, allowing an intoxicated minor to drive when it could have been prevented is a cause of the injury separate from and additional to the intoxication.

B. Assumption of Duty

The Biscans argue that whether or not a duty existed under common law, Mr. Worley voluntarily assumed a duty and then failed to perform that assumed duty with reasonable care. Liability can be imposed for negligent performance of a voluntary undertaking. *Stewart v. State*, 33 S.W.3d 785, 793 (Tenn. 2000). The question of whether a person has assumed a duty to act is a question of law, at least where the material facts giving rise to the duty are undisputed. *Id.* at 793. Thus, this issue is appropriate for resolution by summary judgment if the material facts are undisputed.

"One who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully." *Id.*, quoting *Marr*, 922 S.W.2d at 529. *See also Lett*, 60 S.W.3d at 104; *Nidiffer v. Clinchfield Railroad Co.*, 600 S.W.2d 242 (Tenn. Ct. App. 1980). Whether Tennessee's version of this well-settled rule equates to an adoption of § 324A of the Restatement (Second) of Torts is not entirely clear. *See Messer Griesham,* 45 S.W.2d at 604; *Lett*, 60 S.W.3d at 104; *Marr*, 922 S.W.2d at 529; *Downen*, 2003 WL 2002411, at * 6. Section 324 provides that one who undertakes to render services to another which he should recognize as necessary for the protection of a third person is subject to liability for physical harm to that third person resulting from his failure to exercise reasonable care, if such failure increases the risk of harm. Regardless of whether Tennessee has specifically adopted Section 324, one who assumes to act assumes a duty to act with reasonable care. *Messer Griesham,* 45 S.W.2d at 604.

In *Downen*, this court faced the question of assumption of duty in a similar fact situation. In that case, the adult hosts of a party where they had furnished alcohol to minors began taking up car keys at some point, but discontinued the practice as the night wore on and as they became more intoxicated themselves. The court determined that since there was evidence that the defendants recognized the hazards of allowing teenagers to drive while intoxicated and this concern led them to voluntarily assume the responsibility of collecting ignition keys, there was sufficient evidence to withstand summary judgment on the issue of duty. *Downen*, 2003 WL 2002411, at * 6.

In the case before us, Mr. Worley did not actually take up any keys. Nonetheless, his own deposition testimony established his undertaking and intent with regard to safeguarding the guests and the general public. Consequently, the evidence before the court at the summary judgment stage was sufficient for it to conclude that Mr. Worley voluntarily assumed a duty to ensure that minors who had been drinking did not leave the party by driving.

Because the law imposed a duty upon Mr. Worley and/or because he voluntarily assumed a duty, the trial court properly denied his motion for summary judgment. It was left to the jury to

decide if he breached the duty of reasonable care.[21]

## IV. Issues Regarding Fault of Each Party

The defendants have raised a number of issues that can generally be described as relating to the jury's allocation of fault among the parties. The first deals with whether the defendants could be held liable to any extent.

## A. Intervening Cause

The trial court instructed the jury on how to allocate fault among the parties whose negligence the jury determined contributed to Jennifer's injuries. In addition to those thorough instructions, Mr. Worley requested that the court also include an instruction on intervening cause. In arguing for inclusion of the instruction, counsel for Mr. Worley stated that even if Mr. Worley had been negligent, "the negligent acts of Jennifer and Hughes were the proximate cause of the accident. That would break the chain of Paul Worley . . ."

The trial court refused to include that instruction, and on appeal Mr. Worley asserts that decision was erroneous. Trial courts should give requested jury instructions where those instructions are supported by the evidence, embody the party's theory, and are correct statements of the law. *Otis*, 850 S.W.2d at 445. Conversely, a trial court can refuse to give a requested charge to the jury if it is not supported by the evidence, its substance is already covered in the general charge, or it is incorrect or incomplete in any respect. *Ingram v. Earthman*, 993 S.W.2d 611, 635 (Tenn. Ct. App. 1998). Only when the denial of a requested instruction that could have been given under the previously stated rules prejudices the rights of the requesting party must this court vacate the judgment. *Souter v. Cracker Barrel Old Country Store, Inc.*, 895 S.W.2d 681, 684 (Tenn. Ct. App. 1994).

The instruction requested by Mr. Worley was based upon the doctrine of independent intervening cause which, where applicable, will relieve a negligent actor from liability. Separate and distinct sequential acts by different defendants may be contributing causes of an injury, but the chain of legal causation between the first negligent act and the eventual injury may be broken by a new, independent, intervening cause. *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991)*; Waste Management, Inc. of Tennessee v. South Cent. Bell Tel. Co.*, 15 S.W.3d 425, 432 (Tenn. Ct. App. 1997). The intervening cause doctrine has been called a common-law liability-shifting device. *Waste Management, Inc.*, 15 S.W.3d at 432.

---

[21]At trial, Mr. Worley moved for a directed verdict on the allegations of negligence *per se* and the request for punitive damages. Because the jury found that Mr. Worley was not liable for punitive damages, that issue is moot. Mr. Worley appeals the denial of directed verdict with regard to negligence *per se*. Those claims were alleged as one of three alternative sources for the duty owed by Mr. Worley. Because we have found that the other two sources were sufficiently alleged and proved to allow Mr. Worley's negligence to go to the jury, and because the jury's general verdict of negligence on his part could have been based upon its determination that he breached either the duty imposed upon him by law or the duty he voluntarily assumed, or both, we need not reach the negligence *per se* issues.

Simply stated, the doctrine provides that a negligent actor will be relieved from liability when a new, independent and unforeseen cause intervenes to produce a result that the negligent actor could not have reasonably foreseen.

> [A]n independent intervening cause breaks the chain of proximate causation and thereby precludes recovery. The law is equally clear, however, that '[a]n intervening act, which is a normal response created by negligence, is not a superseding, intervening cause so as to relieve the original wrongdoer of liability, provided the intervening act could have reasonably been foreseen and the conduct [of the original wrongdoer] was a substantial factor in bringing about the harm.' . . . Accordingly, 'an intervening act will not exculpate the original wrongdoer unless it is shown that the intervening act could not have been reasonably anticipated.'

*White v. Lawrence*, 975 S.W.2d at 529, *quoting McClenahan*, 806 S.W.2d at 775.

Thus, foreseeability is the critical question in an analysis of intervening cause. "The test of liability under the law of intervening cause requires a person to anticipate or foresee what usually will happen." *Fly v. Cannon*, 836 S.W.2d 570, 574 (Tenn. Ct. App. 1992).

In the case before us, Mr. Worley asserts that the intervening acts were Hughes Brown's intoxication and decision to drive and the decision by Jennifer Biscan to leave the party with the intoxicated Brown. Not only do we believe that these acts were foreseeable by Mr. Worley, but his own testimony establishes that he anticipated that minors would drink alcohol at the party and would drive afterward if allowed to. He was concerned about the consequences of their drinking and then driving. That concern prompted him to impose, although ineffectively, the rule requiring attendees who drank to spend the night. He should have reasonably anticipated the danger to an intoxicated minor driver and to any minor passengers of that driver. His testimony establishes that he did anticipate that and other potential dangers.

Similarly, Hughes Brown argues on appeal that reasonable minds could find that Jennifer Biscan's negligent decision to accept a ride with him constituted an intervening or superseding cause of her injuries. Of course, to be an intervening cause, the negligent act must occur between the original tortfeasor's negligence and the injury. Jennifer's decision to become Hughes's passenger came before, not after, Hughes Brown's negligent driving that resulted in the accident and Jennifer's injuries.

Consequently, the facts of this case do not support a defense of independent intervening cause that would relieve either Mr. Worley or Hughes Brown of liability for their negligent acts. Accordingly, the trial court properly declined to give the requested instruction.

25

B. Allocation of Fault to Jennifer Biscan

Another group of issues raised by the defendants involves Jennifer Biscan's relative fault. On appeal the defendants assert that certain evidentiary and jury instruction decisions by the trial court were erroneous. It is important to note that the jury allocated 15% of the fault for her injuries to Jennifer's own negligence. Thus, the implication of defendants' arguments is that the jury would have or may have allocated a greater percentage of fault to Jennifer if the trial court's rulings were otherwise. For purposes of the following discussion, it is also important to note that the defendants have consistently identified Jennifer's negligence as her decision to get into the car with Hughes Brown, who was intoxicated.

It is well settled that passengers in motor vehicles have a duty to exercise reasonable or ordinary care for their own safety. *Cole v. Woods*, 548 S.W.2d 640, 643 (Tenn. 1977); *Harrison v. Pittman*, 534 S.W.2d 311, 315 (Tenn. 1976); *Schwartz v. Johnson*, 152 Tenn. 586, 280 S.W.3d (1926); *Grandstaff v. Hawks*, 36 S.W.3d 482, 492 (Tenn. Ct. App. 2000); *Brown v. Chesor*, 6 S.W.3d 479, 482 (Tenn. Ct. App. 1999); *Mansfield v. Colonial Freight Sys.*, 862 S.W.2d 527, 531 (Tenn. Ct. App. 1993). This duty includes the duty to refrain from riding in an automobile operated by an intoxicated or reckless driver. *Cole*, 548 S.W.2d at 643; *Chesor*, 6 S.W.3d at 482; *Mansfield*, 862 S.W.2d at 531; *Harvey v. Wheeler*, 57 Tenn. App. 642, 646, 423 S.W.2d 285 (1967).

Before Tennessee's adoption of comparative fault, a passenger's negligence in riding with an intoxicated driver could preclude any recovery on the basis of contributory negligence or implied assumption of the risk. *Mansfield*, 862 S.W.2d at 531. Under the law as it existed then, a passenger who knowingly rode with an intoxicated driver could not, as a general matter, recover for injuries caused by the intoxicated driver's negligence because of the passenger's own negligence in failing to avoid a known risk. *Wilson v. Tranbarger*, 218 Tenn. 208, 227, 402 S.W.2d 449, 457 (1965); *Hicks v. Herbert*, 173 Tenn. 1, 6, 113 S.W.2d 1197, 1199 (1938); *Schwartz*, 152 Tenn. at 592, 280 S.W. at 33; *Harvey*, 57 Tenn. App. at 646, 423 S.W.2d at 285.

Under comparative fault principles applicable to this case, a plaintiff's negligence in failing to act reasonably is no longer a complete bar to recovery for injuries from a negligent defendant. *Eaton v. McLain*, 891 S.W.2d 587, 592 (Tenn. 1994); *Perez v. McConkey*, 872 S.W.2d 897, 905 (Tenn. 1994); *McIntyre v. Balentine*, 833 S.W.2d 52, 56-57 (Tenn. 1992). Consequently, as with other types of plaintiffs, the reasonableness of the passenger's conduct in light of the known risk associated with riding in a car with an intoxicated driver must be compared with the negligence of the driver and others. *Spinmaker's*, 878 S.W.2d at 939; *LaRue*, 966 S.W.2d at 427.

Whether a passenger was negligent, or failed to use reasonable care, is measured by the standard of whether the passenger "knew or should have known of the driver's intoxication at the time the guest-passenger volunteered to ride in the automobile." *Mansfield*, 862 S.W.2d at 531, quoting *Harvey v. Wheeler*, 57 Tenn. App. at 646, 423 S.W.2d at 285. The reasonableness of the passenger's decision to ride with the driver is a question left to the trier of fact. *Chesor*, 6 S.W.3d at 483; *LaRue*, 966 S.W.2d at 426. The passenger's conduct is measured by that of an ordinarily

prudent person in the same circumstances. *Chesor*, 6 S.W.3d at 482-83; *Harvey*, 57 Tenn. App. at 647, 423 S.W.2d at 285.

In the case before us, the jury considered the evidence and concluded that Jennifer's decision to ride with Hughes Brown was not reasonable under the circumstances and, consequently, she acted negligently. There is no challenge to this determination.

Once the jury decides that the plaintiff as well as the defendant(s) were negligent, the allocation of fault for the injuries among the negligent parties is a question of fact within the jury's province. The Supreme Court of Tennessee has made it clear that the question of how to apportion fault among the parties is ultimately dependent upon the circumstances of the case and one that is left to the jury's common sense and experience when the jury is properly instructed on the relevant factors. *Eaton*, 891 S.W.2d at 593. The Court has also explained some of the factors to be considered:

> . . . [T]he percentage of fault assigned to each party should be dependent upon all the circumstances of the case, including such factors as: (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Id*. at 592 (footnotes omitted). The defendants herein have not directly attacked the jury's apportionment.

## 1. Facts

Because of her injuries Jennifer was unable to remember much of the party or any of the details concerning her decision to ride with Hughes Brown. Jennifer testified at trial primarily regarding her life and activities after her injuries. She was not questioned about the events leading up to the accident, and the defendants did not cross-examine her at all. Instead, part of her pre-trial deposition was read into evidence.

The jury did hear evidence that for some years prior to the accident Jennifer suffered from anxiety, accompanied by panic attacks. At the party, Jennifer encountered her former boyfriend's new girlfriend and was upset by their interaction. She left the area where most of the group had gathered and ended up getting into a parked car occupied by some boys she knew. Something happened in the car that made her uncomfortable. She got out of the car and ran into her longtime friend Hughes Brown.

27

Hughes was about to leave the party to get home by his 11:30 p.m. curfew. Although Jennifer came to the party with the intention of spending the night, she now wanted to leave. According to Hughes, Jennifer asked him to give her a ride. Hughes testified that after she got in the car Jennifer asked him how many beers he had drunk, and he told her at least six.[22]

While there was testimony from some party goers that Hughes Brown appeared intoxicated to them before he left the party, others who saw and spoke with him testified he did not appear intoxicated. Further, the law enforcement and emergency personnel who first appeared on the scene of the accident testified that Hughes Brown did not appear intoxicated, but instead appeared coherent and oriented, and gave no signs of intoxication until subjected to a field sobriety test. A series of such tests revealed significant impairment and led to Hughes's immediate arrest for driving under the influence.

Hughes Brown testified that he consumed two beers before he went to the party. After he got there, he got a twelve-pack of beer from Dana Biscan, as previously arranged. He carried this beer around during the party. He admitted drinking seven or eight beers. After the accident, Hughes threw a partial carton of beer over the rail, and the law enforcement officer on the scene found the box with five or six unopened cans of beer in it.

In part of her deposition read to the jury, Jennifer testified that she knew the effects of alcohol. Her father had had discussions with Jennifer about alcohol. Information about alcohol and its effects had been given to the students in her school.

Because the jury found Jennifer negligent and allocated fault to her, it obviously found the above-described evidence sufficient to determine that Jennifer knew or should have known that Hughes Brown was intoxicated when she got in the car with him.

### 2. Jennifer's History With Consumption of Alcohol

The defendants sought to introduce evidence of Jennifer Biscan's consumption of alcohol at times before the day of the party, primarily through the testimony of other teenagers who had seen Jennifer drink in the past. The Biscans sought to prevent the introduction of such evidence through a motion *in limine* requesting the exclusion of evidence of Jennifer's history of alcohol

---

[22]The Biscans question the credibility of this statement based on other statements made by Hughes that were refuted by physical evidence. For example, Hughes also testified that after he got into the car he got out two beers, handed one to Jennifer, who opened it, and kept one for himself, which he opened and began drinking. No personnel at the scene of the accident found any opened cans of beer in the car or in the vicinity, and there was no evidence of recently spilled beer in the car or on the occupants. In any event, the jury is the arbiter of credibility. The jury herein was able to assess this statement along with other testimony.

consumption.[23]

Ultimately, the trial court determined that Jennifer Biscan's knowledge of the effects of alcohol was relevant to the reasonableness of her decision to accept a ride with Mr. Brown when she knew that he had been drinking. The trial court allowed evidence on that issue, but determined that Jennifer's own personal prior drinking experience was not relevant and, even if relevant, was more prejudicial than probative. The proposed testimony was preserved through jury-out proffers.[24]

On appeal, the defendants assert that the trial court's refusal to allow them to "fully develop" Jennifer Biscan's history with regard to her consumption of alcohol prior to the accident was reversible error. They argue that her history with alcohol was relevant to the reasonableness of her decision to accept a ride with an intoxicated Hughes Brown. In particular, they rely on two of the factors enumerated in *Eaton*: (1) whether the party knew or should have known of the risk and (2) the parties' particular capabilities, such as age, maturity, training, education.

The defendants primarily rely on two cases for the proposition that a minor's prior experience in drinking alcohol is relevant. In *Brookins*, 624 S.W.2d 547, a minor who illegally purchased alcoholic beverages sued the store where he purchased the beverages and the restaurant where he drank a beer for injuries he received in an accident resulting from the negligence of the driver, an intoxicated friend under the legal age for drinking who had shared in the alcohol. The minor plaintiff argued that if he had not been drinking himself, he would not have ridden with his intoxicated friend. He argued that his own drinking diminished his capacity to exercise reasonable care for his safety and prevented him from realizing the seriousness of the danger in riding with his intoxicated friend. The Supreme Court held that because the plaintiff was a minor, his judgment and capacity to act responsibly was put at issue. The Court held that minority itself, with its implicit lack of capacity and judgment, was sufficient to defeat summary judgment "predicated upon the conduct of the plaintiff after he purchased the alcoholic beverages." *Id.* at 550. Turning to the factual question of

---

[23]At the hearing on the motions, counsel for Hughes Brown argued that Jennifer's prior experience with alcohol was relevant "to show what she knew or should have known about the effects of alcohol" because Mr. Brown's primary defense was "that Jennifer Biscan was at fault and negligent for becoming a passenger in a vehicle with a person she knew was drinking." Counsel for Mr. Brown argued that he wanted to be able to prove that "at the time she accepted a ride with Hughes Brown to leave the party, that she could recognize . . . That she knew the signs of alcoholic consumption." On the other side, counsel for Jennifer Biscan argued that while the defendants could inquire into how much Jennifer drank on the night of the party, whether she was intoxicated then, how much Hughes Brown had to drink that night, and whether Jennifer had ever seen Hughes Brown having trouble driving before, her personal consumption of alcohol prior to the day of the accident was not relevant and was highly prejudicial. The Biscans' counsel argued that the defendants intended to portray Jennifer as a party girl with prejudicial effect on her credibility and on her recovery of damages. He also relied on Tenn. R. Evid. 609 as precluding evidence of prior bad acts, other than convictions of crime, for purposes of attacking a witness's credibility.

[24]Outside the presence of the jury, both Mr. Worley and Mr. Brown proffered testimony by several of Jennifer Biscan's classmates and fellow attendees of the party at the Worley home regarding the frequency of Jennifer Biscan's prior alcohol consumption. Of the nearly ten witnesses, only a handful were able to recall any specific instances in which Jennifer Biscan consumed alcohol prior to the day of the party.

29

the plaintiff's capacity to act responsibly, the Court noted that the only evidence in the record at the summary judgment stage showed that the minor plaintiff had no experience with alcohol and, therefore, had no reason to suspect he and his friend would become intoxicated on the amount of alcohol purchased.

The *Brookins* holding is based on two principles. The first is that a person who voluntarily becomes intoxicated can be found negligent if his or her conduct does not meet the standard of care required of a sober person; voluntary intoxication does not relieve a person of his or her own negligence. *Kirksey*, 739 S.W.2d at 235; *Russell v. Smith*, No. 88-366-II, 1989 WL 71045, at *2 (Tenn. Ct. App. June 30, 1989) (no Tenn. R. App. P. 11 application filed). The second is that before a minor's intoxication can be considered voluntary, the minor must be shown to have had the capacity to act responsibly in deciding whether to consume the alcohol. *Brookins*, 624 S.W.2d at 550; *Russell*, 1989 WL 71045, at *2.

*Russell* involved a minor who was killed when he ran out into a highway while intoxicated and was hit by traffic. His parents brought a wrongful death action against the owners of the liquor store where the minor allegedly purchased the alcohol. This court concluded that the jury decided that it was the minor's willful consumption of alcohol, not its sale, that was the cause of his death. Because one who becomes voluntarily intoxicated may be held liable for his conduct, and because the deceased was a minor, the determinative question was whether the deceased minor had the capacity to become intoxicated voluntarily. 1989 WL 71045, at * 2. The court concluded that there was ample evidence of the minor's prior consumption of alcohol and prior drunkenness from which the jury could have concluded that the minor had the capacity to realize the consequences of drinking the amount of alcohol he consumed on the night in question. Consequently, the jury could have concluded that the minor's intoxication was voluntary and, therefore, he was contributorily negligent.

A third case cited by defendants, *Kirksey*, 804 S.W.2d 68, involved a wrongful death claim for the death of an adult from the effects of ten or more "Zombies" consumed, on a bet, within a short period of time. The owner, bartender, and waitress from the bar serving the deceased were sued, along with the person who waged the bet with the deceased. The deceased's contributory negligence was an issue. The deceased's parents argued on appeal that it was error for the trial court to admit evidence of the deceased's prior use and abuse of alcohol and drugs. This court held otherwise, and stated that in a wrongful death action (in that case involving death from consumption of the alcohol itself), "a deceased's personal habits as to sobriety are admissible." *Id*. at 74.

All these cases involved the question of voluntary intoxication, and prior drinking experience was relevant to that issue. The decision to ride with an intoxicated driver, however, is different from the decision to drink alcohol. While there was evidence indicating Jennifer drank something at the party, a test taken at the hospital revealed her blood alcohol level to be only .032.[25] The defendants do not assert that Jennifer's consumption of alcoholic beverages at the party had any effect on her

---

[25]There was some evidence this result could have been attributed to medication given her upon her arrival at the hospital and before the blood alcohol test.

decision to ride with Hughes Brown. To the contrary, they specifically argued to the trial court that Jennifer's alcohol consumption on the night of the accident was not relevant "except for the fact that she was sober and even had a better chance to understand."

Because the defendants herein do not attempt to argue that Jennifer's drinking of alcoholic beverages at the party affected her judgment in riding with Hughes Brown, the cases regarding voluntary intoxication are not applicable. Prior knowledge of the effect of alcohol on one's self is relevant to the decision to drink and to the voluntariness of intoxication. Knowledge of the effects of alcohol on another's ability to drive is not dependent on personal experience with alcohol. We note that defendants did not examine Jennifer with regard to her prior observation of Hughes Brown drinking or operating a car after drinking.

On appeal, the Biscans assert that, to the extent the proffered evidence that Jennifer may have consumed alcohol on prior occasions was probative of her knowledge of alcohol, it was merely cumulative to other evidence relevant to that issue. In light of the jury's finding that Jennifer was negligent, with the necessary implication therefrom that she knew or should have known Hughes Brown was intoxicated, we agree with the Biscans' position. Obviously, the jury heard sufficient evidence of Jennifer's knowledge of the effects of alcohol to cause it to determine she was partially at fault for her injuries.

Because other evidence relevant to Jennifer's assessment of Hughes's level of intoxication and the dangers associated therewith was presented, the Biscans assert the proffered evidence was properly excluded because its potential unfair prejudice outweighed its probative value, relying on Tenn. R. Evid. 403.[26] In applying Rule 403, a trial court must engage in a balancing process. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999).

As discussed above, the probative value of testimony that Jennifer had consumed alcoholic beverages in the past was, at best, minimal on the issue of whether she knew or should have known of the risks associated with riding with Hughes Brown. Its potential prejudice, however, is obvious. Defendants' attempts to portray Jennifer as previously reckless with regard to her own consumption of alcohol would have confused that prior conduct with the only basis upon which the allegations of negligence on her part rested: the decision to accept a ride with Hughes Brown.

Having reviewed the record, we conclude that the trial court did not exceed or abuse its discretion in excluding the proffered evidence. *State v. Gilliland*, 22 S.W.3d 266 (Tenn. 2000);

---

[26]They also argue that Tenn. R. Evid. 608(c), dealing with evidence of character or conduct of a witness relevant to the witness's truthfulness, precludes admission of the proffered evidence. That rule provides:

> Evidence of specific instances of conduct of a witness committed while the witness was a juvenile is generally not admissible under this rule. The court may, however, allow evidence of such conduct of a witness other than the accused in a criminal case if the conduct would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination in a civil action or criminal proceeding.

*Herbert ex rel. Herbert v. Brazeale*, 902 S.W.2d 933 (Tenn. Code App. 1995). It properly considered the relevance, probative value, and prejudice of the evidence and ruled within the discretion granted in Rule 403. *See Richardson v. Miller*, 44 S.W.3d 1 (Tenn. Ct. App. 2000). We affirm the trial court's grant of the motion to exclude the proffered evidence regarding Jennifer Biscan's prior history of alcohol consumption.

### 3. Juvenile Court Records Regarding Jennifer Biscan

One specific area of evidence regarding Jennifer Biscan's prior experience with alcohol consumption that the defendants wanted to introduce involved her juvenile record, including a juvenile court adjudication suspending her driver's license. The trial court granted the Biscans' motion to exclude that evidence, specifically excluding "testimony regarding Jennifer Biscan's prior juvenile court record and the suspension of her driver's license." The record before us includes only a copy of a juvenile court order that was marked for identification. In a jury-out proffer, Jennifer's father testified that he was aware that Jennifer had received juvenile court citations on two occasions prior to the accident. He explained the fact situations surrounding the citations, as he understood them, and neither involved Jennifer actually drinking alcohol. With regard to the second, which apparently resulted in the adjudication also proffered, Mr. Biscan was angry with Jennifer because she allowed a boy in her car with a can of beer, even though her father had told her not to be around people who drink. Consequently, Mr. Biscan would not hire a lawyer for Jennifer and required her to go to court and "take her punishment." The defendants have referred us to no other proffers of evidence they assert was wrongly excluded.

The defendants argue that "the facts underlying" the juvenile court citations and the loss of her driver's license were important evidence "of Jennifer Biscan's history of alcohol possession and consumption." In addition, they argue that Jennifer's failure to heed her father's advice to refrain from consuming alcohol after the citations was "relevant to the issues of her experience with alcohol and maturity level at the time she accepted a ride with an intoxicated Hughes Brown." Thus, the defendants make essentially the same argument here as they made with regard to Jennifer's history of personal alcohol consumption. Again, the argument does not distinguish between Jennifer's negligence in riding with Hughes Brown and her conduct in drinking at the party to a small enough degree that the defendants do not argue it affected her judgment.

On appeal, the Biscans assert that the trial court's order was proper based on Tenn. Code Ann. § 37-1-133(b) and Tenn. R. Evid. 608(c) & 609(d) and also argue that the proffered evidence was irrelevant, unfairly prejudicial, confusing, and would have been misleading to the jury.

Tenn. Code Ann. § 37-1-133(b) bars the admission of juvenile adjudications and evidence adduced in juvenile court hearings in subsequent proceedings. It states:

> The disposition of a child and evidence adduced in a hearing in juvenile court may not be used against such child in any proceeding in any court other than a juvenile court, whether before or after reaching majority, *except* in dispositional proceedings

32

after conviction of a felony or the purposes of a pre-sentence investigation and report.

Tenn. Code Ann. § 37-1-133(b) (emphasis added). This statute would clearly prohibit the introduction of the adjudication proffered by the defendants herein and any testimony regarding the evidence adduced in juvenile court. The statutory exception clearly does not apply in the case herein. *See State v. Stockton*, 733 S.W.2d 111, 112 (Tenn. Crim. App. 1986) (holding that a juvenile's record may be considered "in dispositional proceedings after conviction of a felony for the purpose of a pre-sentence investigation and report").[27]

The defendants provide no explanation as to why Tenn. Code Ann. § 37-1-133(b) should not apply, instead merely arguing that Jennifer's history with alcohol, including the juvenile court record, is relevant to assessing her negligence. They also argue that the holding in *Russell v. Smith*, *supra*, allows for the introduction of the prior juvenile adjudication. In *Russell*, the jury considered the fact that a minor had previously become so intoxicated that he was arrested by the police and taken to a juvenile detention center as part of its determination of whether the minor had the capacity to become voluntarily intoxicated. *Id*. at *2. *Russell* is distinguishable in that there was apparently no attempt to introduce the actual juvenile court disposition or facts from the hearing.

In addition to the statute, the rules of evidence indicate a reluctance to allow the use of bad conduct as a juvenile or a juvenile court record. For example, Tenn. R. Evid. 609(d)[28] provides:

> Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however, allow evidence of a juvenile adjudication of a witness other than the accused in a criminal case if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination in a civil action or criminal proceeding.

In addition to the specific protection given by the statute and the rules to juvenile records, the evidence sought to be introduced herein is still subject to the probative value - prejudicial effect balancing of Tenn. R. Evid. 403. For the same reasons we concluded that the trial court did not err in excluding evidence relating to Jennifer's prior consumption of alcohol, we find that the trial court acted within its discretion in excluding the juvenile court adjudication and proffered testimony.

---

[27]Our courts have adopted another exception to the general rule expressed in the statute. That exception allows impeachment of a character witness, at least one for a defendant in a criminal case, through questioning of the witness's knowledge of juvenile charges against the defendant, but is subject to a number of limitations. *Stepheny v. State*, 570 S.W.2d 356, 359 (Tenn. Crim. App. 1987); *State v. Sexton*, No. E2000-01779-CCA-R3-CD, 2002 WL 1787946, at *13-16 (Tenn. Crim. App. Aug. 2, 2002). Defendants have not argued that this exception applies.

[28]The Advisory Commission Comments to this section state it follows the current philosophy expressed in Tenn. Code Ann. § 37-1-133(b).

33

## 4. Amnesiac Charge

On appeal, Hughes Brown argues that the trial court erred in charging the jury regarding the law in Tennessee of the presumption afforded an amnesiac. At trial, it was proved that Jennifer Biscan had no memory of the accident, and little memory of the events on the day of the party before the accident. The trial court charged the jury as follows:

> Where the loss of memory renders a party incapable of testifying as to an incident before the Court, and this loss of memory is attributable to that incident, you must presume that the party exercised reasonable care during the time leading up to the incident and that the party exercised reasonable care at the time of the incident. This presumption is rebuttable. If you determine that the defendants have introduced evidence to the contrary, you shall weigh that evidence against any evidence introduced at trial that tends to show the plaintiff acted with reasonable care.

This instruction accurately stated the law. In Tennessee, an amnesiac is afforded the presumption that he or she acted with due care as to events about which the amnesiac has no memory. *Ammons v. Bonilla*, 886 S.W.2d 239, 245 (Tenn. Ct. App. 1994); *Oder v. Parks*, 34 Tenn. App. 303, 237 S.W.2d 571, 576 (1948). This presumption, like that applicable to a dead person, is intended to preserve fairness because of one party's inability to tell his or her version of the events. However, as the jury instruction made clear, the presumption is rebuttable by evidence that the amnesiac did not act with due care. *Jeffreys v. Louisville & N. R.R. Co., Inc.*, 560 S.W.2d 920, 921 (Tenn. Ct. App. 1977).

On appeal, Hughes Brown argues that the jury charge was inappropriate because (1) it was never contended that Jennifer Biscan was guilty of negligence during Hughes Brown's operation of the vehicle; (2) there was evidence that Jennifer acted without due care as to her safety;[29] and (3) the fact that the jury was charged that Jennifer Biscan had a presumption of due care unfairly and inappropriately sent a message to the jury that all of her actions that night were reasonable. Since the only negligence attributed to Jennifer by the defendants was her decision to ride in the car with the intoxicated Hughes Brown driving, we find little relevance in the first and last argument.

With regard to the argument that the amnesiac instruction should not have been given because there was some evidence that Jennifer did not act with due care in deciding to ride with Hughes Brown, we disagree with Mr. Brown's interpretation of authority on that issue. His reliance on *Lemons v. Memphis Transit Management Co.*, 56 Tenn. App. 737, 413 S.W.2d 88 (1966) and *Jeffreys*, 560 S.W.2d at 922, is misplaced. In *Lemons*, this court determined that the trial court's partial instruction failed to properly instruct the jury on the presumption of due care. In *Jeffreys*, this court affirmed the trial court's grant of a directed verdict to the defendants because all the evidence

---

[29] Mr. Brown refers to jury out testimony that Jennifer Biscan consumed alcohol in the past, and that evidence was excluded. He also refers to evidence that Jennifer was at the Worley party where there was underage drinking and she in fact drank alcohol at that party.

introduced contradicted the presumption that the amnesiac acted with due care in crossing a railroad track.

In the case before us, there was conflicting evidence as to whether Jennifer exercised due care in riding with Hughes; i.e., whether she knew or should have known he was intoxicated. In that circumstance, the question of reasonableness was a question of fact for the jury to resolve, and the instruction on the presumption was proper. In *Fergus v. Action Cartage & Distribution, Inc.*, 1990 WL 43463, at * 4 (Tenn. Ct. App. April 17, 1990), this court addressed the same argument raised herein and held the presumption was appropriately charged because it was for the jury to determine if evidence existed to the contrary. The court further stated, "Defendants have not cited to this Court a single case that stands for the proposition that when any evidence of lack of due care is introduced, the charge regarding presumption of due care should not be given." *Id*. We agree with the *Fergus* court and its holdings.

Moreover, as the Biscans point out, the jury apportioned fifteen percent of the fault to Jennifer Biscan after hearing the charge and applying the evidence that was introduced. Obviously, the jury determined that the presumption was rebutted by the evidence. Thus, we cannot see how Mr. Brown was harmed by the instruction.

### 5. Exclusion of Testimony of Dr. Mitchell

The defendants assert it was error for the trial court to refuse to allow their proposed expert witness, Dr. William Mitchell, to testify. The defendants proposed to have Dr. Mitchell testify as to the effects of intoxication related to blood alcohol level. He would have opined that based on the toxicology report that Hughes Brown's blood alcohol level was .17% after the accident, Mr. Brown would have exhibited signs of intoxication at the time of the accident. Thus, this proof would have been cumulative to other evidence introduced to show that Jennifer Biscan knew or should have known Hughes Brown was intoxicated.

Important to our analysis is the procedural posture of the issue at the time of the court's ruling. Approximately a month before trial, Mr. Worley supplemented his interrogatory answers, pursuant to Tenn. R. Civ. P. 26, to notify the plaintiffs that he anticipated calling Dr. Mitchell, who was identified as a professor of toxicology,[30] to testify as an expert. In addition to the opinion regarding Hughes Brown's likely display of the signs of intoxication, the Rule 26 disclosure also stated, "Moreover, relatively inexperienced teenage drivers would be expected to demonstrate the full effects of intoxication with little ability to mask the adverse effects on motor function and speech." A copy of Dr. Mitchell's report was attached.

The Biscans then deposed Dr. Mitchell. They filed a motion *in limine* to exclude Dr. Mitchell's testimony. At the hearing on that motion, the court had before it the Rule 26 disclosure

---

[30]As counsel for Mr. Worley later acknowledged, this was a misstatement. Dr. Mitchell is a professor of pathology.

and the deposition transcript. Mr. Worley did not supplement this information or call Dr. Mitchell to testify at the pre-trial hearing on the Biscans' motion. Dr. Mitchell did later testify in a jury-out proffer near the end of the trial. No explanation of the proffer preceded it, and it was presumably made for the purpose of preserving the witness's testimony. Consequently, we agree with the Biscans that the court's ruling must be examined based on the information presented to the court at the time of the hearing on the motion.[31]

The Biscans moved to exclude Dr. Mitchell on the grounds that he was not qualified by knowledge, skill, experience, training or education to provide expert testimony as to the matters the defendants had identified in their Rule 26 disclosure. They asserted that Dr. Mitchell based his conclusions as to the effect of alcohol on his experience as a dormitory headmaster in the early 1960s and on his reading of literature on the subject, of which he had destroyed all but two articles. The motion also states that "When challenged, however, as to the basis of his conclusion that, at a certain blood alcohol level, '90 percent' of teenagers would exhibit certain effects of alcohol, Dr. Mitchell admitted that his basis for that conclusion was 'just observation.'" Thus, they argued, his opinion was not based upon the types of data or information required by Tenn. R. Evid. 702 and would not substantially assist the trier of fact.

The defendants jointly responded to the motion. They pointed out that the Biscans had placed too much emphasis on Dr. Mitchell's passing mention of his observation of teenagers and alcohol as a dormitory headmaster. They also stated that Dr. Mitchell was a board certified clinical pathologist with over twenty-five years of experience, who had teaching and research responsibilities. They argued that the court should allow Dr. Mitchell to testify and again reiterated that he was expected to testify that Hughes Brown's blood alcohol level would have "caused him to be visibly intoxicated at the time of the accident."

The trial court granted the Biscans' motion and indicated in the order that its decision was based on Tenn. R. Evid. 702 & 703, and *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997), "on the grounds that William Mitchell is not qualified as an expert to testify as to the issues on which Defendants' have tendered him, as required by Tenn. R. Evid. 702, that William Mitchell has no scientific, technical, or otherwise specialized knowledge on the issues . . . and the facts and data underlying William Mitchell's opinion indicate a lack of trustworthiness."

In general, questions regarding admissibility, qualifications, relevancy, and competency or expert testimony are left to the discretion of the trial court. *Id*. at 263-64. Expert testimony regarding scientific theory or based on technical or specialized knowledge must be both relevant and reliable to be admissible. *State v. Stevens*, 78 S.W.3d 817, 832-33 (Tenn. 2002). Trial courts perform a "gatekeeping" function to insure that proposed expert testimony meets the levels of relevance and

---

[31]We note that , at the end of the proffer, the defendants' counsel asked the court if it was "sticking by" its prior ruling, and the court affirmed it was. The record does not reflect that the court was asked prior to the proffer to reconsider its ruling excluding Dr. Mitchell's testimony. At that point in the proceedings, the court would have been justified in denying a motion to reconsider and a request to put on proof to establish the qualifications the court had previously found missing. *See Robinson v. LeCorps*, 835 S.W.3d 718, 725 (Tenn. 2002).

reliability established in Tenn. R. Evid. 702 & 703. Those rules state:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702.

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

The primary inquiry under these rules is whether the expert opinion testimony will substantially assist the trier of fact to understand the evidence or to determine a fact in issue. Prior to the adoption of the standard set out in Rule 702, expert testimony was admissible only if it was necessary. *State v. Shuck*, 953 S.W.2d 662, 668 (Tenn. 1997); *Casone v. State*, 193 Tenn. 303, 246 S.W.2d 22, 26 (1952) (holding that "the subject under examination must be one that requires that the court and jury have the aid of knowledge or experience such as men not specially skilled do not have, and such therefore as cannot be obtained from ordinary witnesses.") The necessity requirement no longer applies, but

> [w]hile the substantial assistance standard of Rule 702, Tenn. R. Evid., is a relaxation of the common law necessity requirement, it is somewhat stricter than the comparable federal rule of evidence which permits expert testimony upon a finding that it merely assists the trial of fact.

*Shuck*, 953 S.W.2d at 668. Thus, in Tennessee, the probative force of the testimony must be stronger than that required under the federal rules. *McDaniel*, 955 S.W.2d at 265.

The trial court must also make a determination as to the witness's qualification by knowledge, skill, experience, training or education to express an opinion within the limits of the demonstrated expertise. As to this question, the determinative factor is "whether the witness's qualifications authorize him or her to give an informed opinion *on the subject at issue*." *Stevens*, 78 S.W.3d at 834.

In addition to determining the qualification of the expert, the court is also required to determine whether the expert evidence is reliable or valid. *Van Tran*, 66 S.W.3d at 819; *State v.*

*Farner*, 66 S.W.3d 188, 207 (Tenn. 2001). One purpose of this examination is for the court to assure itself that the opinions of the expert "are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." *Farner*, 66 S.W.2d at 207-208, quoting *McDaniel*, 955 S.W.2d at 265. Among the nondeterminative and nonexclusive factors that can be considered in determining reliability are (1) whether the scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation. *Stevens*, 78 S.W.3d at 832, 835; *McDaniel*, 955 S.W.2d at 265.

The trial court must ensure that the basis for the expert witness's opinion (e.g. testing, research, studies, or experience-based observations) adequately supports that expert's conclusion or, in other words, whether there is an analytical gap between the data relied upon and the opinion proffered. *Stevens*, 78 S.W.3d at 834. A connection between the underlying data and the conclusion must exist. *Id*. This connection "is of especial importance when determining the reliability of experience-based testimony, because observation and experience are not easily verifiable by the court." *Id*. Through the language of Tenn. R. Evid. 703, Tennessee courts are encouraged to take a more active role (as compared to federal courts) in the evaluating the reasonableness of the expert's reliance on the particular facts or data that form the basis for the expert testimony or opinion. *Seffernick v. Saint Thomas Hosp.*, 969 S.W.2d 391, 393 (Tenn. 1998); *McDaniel*, 955 S.W.2d at 265.

The trial court has broad discretion regarding the admission of expert testimony. *Robinson v. LeCorps*, 83 S.W.3d 718, 725 (Tenn. 2002); *Stevens*, 78 S.W.3d at 832; *McDaniel*, 955 S.W.2d at 263. Consequently, a trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or is abused. *Stevens*, 78 S.W.3d at 832; *Seffernick*, 969 S.W.2d at 393; *Shuck*, 953 S.W.2d at 669. A finding of abuse of discretion is proper when the trial court applied an incorrect legal standard or reached a decision against logic or reasoning that caused an injustice to the party complaining. *Stevens*, 78 S.W.3d at 832; *Shuck*, 953 S.W.2d at 669. Appellate courts will set aside a discretionary decision only where the trial court has misidentified, misconstrued, or misapplied the controlling legal principles or the decision is contrary to the substantial weight of the evidence. *White*, 21 S.W.3d at 223. An appellate court should not substitute its judgment on a discretionary decision and should permit the trial court's exercise of discretion to stand if reasonable judicial minds could differ as to its soundness. *White*, 21 S.W.3d at 223; *Overstreet*, 4 S.W.3d at 709.

Even if a trial court improperly excludes admissible expert evidence, reversal of the judgment is not required if the evidence would not have affected the outcome of the trial even if it had been admitted. *White*, 21 S.W.3d at 223. A judgment should be set aside only if, considering the record as a whole, an error more probably than not affected the outcome of the trial. Tenn. R. App. P. 36(b); *Pankow v. Mitchell*, 737 S.W.2d 293, 297 (Tenn. Ct. App. 1987). Thus, a court's exclusion of otherwise admissible evidence will not require reversal if it did not affect the jury's verdict, if the excluded evidence would not have strengthened the position of the party claiming error in its exclusion, or if the substance of the excluded evidence got to the jury through another source. *Id*.

at 298.

Where the jury has other evidence relevant to the issue it is to decide, and where the jury is able to evaluate that evidence without the opinion of an expert, the exclusion of expert testimony cannot be said to have more probably than not affected the outcome. *See Shuck*, 953 S.W.2d at 670-71 (holding that because a jury "may not be able to properly evaluate the effect of a defendant's cognitive and psychological characteristics on the existence of inducement and predisposition," exclusion of admissible expert testimony on that issue was not harmless error under Tenn. R. Crim. P. 52(a) where entrapment was a defense).

In his deposition filed in support of the Biscans' motion to exclude his testimony, Dr. Mitchell testified that he had been a laboratory-based clinical pathologist for 25 years. He was part of a research project in toxicology fifteen to twenty years ago, but the project did not involve alcohol. He had never performed personal research into the correlation of the clinical effects of alcohol toxicity and blood alcohol levels. He did a literature search on the issue in connection with this case, but it had been at least ten years since he had done a similar search, and that was in connection with another lawsuit. He identified an article on alcohol tolerance and a chapter from a textbook as the best sources he relied upon. He stated he had reviewed other articles, but he had not kept them, and believed the two he mentioned were authoritative.

He also testified as to when, *i.e.*, at what blood alcohol level, persons would exhibit certain signs of intoxication, and agreed that there would be a difference between an inexperienced and an experienced drinker. At that point, he testified that, based on his experience as a dormitory headmaster from 1962 to 1966, where he had responsibility for 18 year olds, generally inexperienced drinkers, "it doesn't take very much alcohol to make them act like fools." Based on those personal observations, he also opined that younger, inexperienced drinkers become obviously intoxicated on far less alcohol than adults "that at least had some experience with drinking."

When asked whether he could tell from these past personal observations that every person at a particular blood alcohol concentration was going to appear intoxicated, he replied "no." Similarly, he acknowledged that his anecdotal observations could not form the basis of an article in a peer review journal. The following exchange also occurred:

Q.     And there's nothing in those observations that you could really testify about that wouldn't be the type of anecdotal information that a lay person could pick up on their own?

A.     Everyone has their own experiences in observing people drink.

He also testified that based on 35 years of observing teenagers, it was his opinion that 90% of teenagers who had a blood alcohol level of .17 would stagger, stumble, weave, and show other signs of intoxication. His observations of teens had not been made with control factors or any methodology for measuring or recording the amount of alcohol actually consumed or the prior

drinking history of those observed. He acknowledged that his 90% estimate probably would not hold up as publishable in a peer review journal without clinical data to back it up. It is clear that the witness's personal observation was not based on scientific study or methodology and did not differ from nonexpert observations.

As to the other bases for the expert opinion, the article relied upon by Dr. Mitchell was published in 1943 in a Scandinavian journal. That article involved results of a study of tolerance to alcohol of inexperienced, moderate, and chronic drinkers. The purpose of the study, as stated in the article, was to "study quantitatively the degree of disturbance of certain functions in man, to repeat these experiments on differing groups of individuals under different conditions, and finally to evaluate the possible relationship between symptoms and blood alcohol level." One of the points was to identify tests that would more reliably indicate intoxication, such as those now included in field sobriety tests. The textbook chapter, from CECIL TEXTBOOK OF MEDICINE, included a table showing blood ethanol levels and their effects and symptoms in "sporadic drinkers" and "chronic drinkers," and Dr. Mitchell frequently referred to this table.

The trial court herein applied the correct legal principles. Based upon the authorities cited above and our review of the record, we conclude that the trial court acted within its broad discretion in excluding Dr. Mitchell's proffered testimony.

At issue herein was whether Jennifer Biscan should have known that Hughes Brown was intoxicated when she got into the car with him. The record includes testimony from various witnesses as to whether Hughes demonstrated any signs of intoxication. Whether a person exhibited signs of intoxication has been the subject of lay witness testimony, and testimony from law enforcement and emergency personnel with more expertise or experience, in hundreds, if not thousands, of cases in this state. Consequently, it is questionable that expert testimony based on past personal observation and generalized principles within the knowledge of the general population would have added anything to the proof or would have substantially assisted the trier of fact. The fact that the law assigns to a passenger, presumably a lay person, the responsibility of assessing the risk of riding with a driver who may be intoxicated leads to the obvious conclusion that the question of whether someone showed the effects of intoxication does not require expert proof.[32]

In addition, even if the expert opinion that Hughes Brown would have demonstrated obvious signs of intoxication should have been admitted, we cannot find, based on the record as a whole, that Dr. Mitchell's testimony, subjected to cross-examination, would have more probably than not affected the outcome.[33] There was other testimony by eyewitnesses regarding Hughes Brown's demonstration of visible signs of intoxication. Despite the testimony of emergency personnel on the

---

[32]Tenn. R. Evid. 701 allows a lay witness to offer opinions rationally based on the witness's perceptions and helpful to an understanding of the testimony or determination of a fact in issue. "Consequently, a lay witness may testify that a person was 'drunk' . . . . Advisory Comm. Cmt. to Tenn. R. Evid. 701. Such a conclusion would, of course, be based upon the witness's observation of the person and knowledge of what a drunk person acts like.

[33]Defendants make no argument that it would have, instead focusing on Dr. Mitchell's qualifications.

scene who saw him firsthand after the accident that he was not obviously intoxicated, the jury found the contrary testimony and evidence sufficient to conclude that Jennifer Biscan was negligent in riding with him. We cannot conclude that an expert's testimony that he would have exhibited signs of intoxication, based upon statistical likelihood from research studies, would have altered the jury's decision. Consequently, reversal would not be warranted even if the testimony should not have been excluded.

### 6. Adult Standard Charge

The trial court properly instructed the jury that Hughes Brown was to be held to an adult standard of care because he was engaged in an adult activity, driving. On this issue, our Supreme Court has stated:

> in assessing a minor's negligence, the minor is generally not held to the same standard of care imposed on adults. Instead, the minor is charged with such care as a reasonably prudent person of like age, capacity, knowledge and experience would be expected to exercise under the same circumstances. Although the law is clear that a minor's conduct is generally not to be judged by an adult standard of care, the law is equally clear that where the minor is engaged in a dangerous activity normally undertaken only by adults, such as driving a car, no special allowance is made for the minor's limited experience or age and, therefore, the minor is held to an adult standard of care. . . . The rule that all drivers of motor vehicles on public highways are held to an adult standard of care applies to driving while intoxicated.

*Cook*, 878 S.W.2d at 937-38.

On appeal, Mr. Brown does not argue that the instruction was improper and agrees that it states the proper standard of care as to him. However, he asserts that the trial court erred in failing to instruct the jury that:

> If they found that Jennifer Biscan was engaged in a dangerous activity no special allowances are made for the minor's limited experience or age and, therefore, the minor is held to an adult standard of care.

The problem caused by the trial court's failure to give this requested instruction is described by Mr. Brown thusly:

> In the absence of the foregoing instruction, the jury was forced to conclude that the conduct of Jennifer Biscan of accepting a ride with an intoxicated driver would be based on a standard of care of a minor and not an adult at the time.

The activity Jennifer engaged in was becoming a passenger in a car. This is not a dangerous activity normally undertaken only by adults. It is engaged in by children and adults alike. For that

41

reason, "The Supreme Court . . . has expressly declined to extend that standard [the adult standard] to a minor guest passenger." *Brown v. Smith*, 604 S.W.2d 56, 58 (Tenn. Ct. App. 1980) (citing *Duvall Transfer & Delivery Serv. v. Beaman*, 218 Tenn. 348, 403 S.W.2d 315 (1966) and *Houser v. Persinger*, 57 Tenn. App. 401, 419 S.W.2d 179 (1967)). The argument made herein attempts to equate the activity (becoming a passenger) with the negligence (knowingly becoming a passenger of an intoxicated driver.)

We therefore find that the trial court made no reversible error in refusing to charge the jury that Jennifer Biscan should be held to an adult standard of care.

### C. Allocation of Fault to Hughes Brown - Testimony by Police Officers and Medical Personnel About His Post-Accident Behavior

Police officers and emergency medical technicians who were present at the accident scene testified regarding the facts of the accident and their activities at the scene, including any medical treatment given and their assessment of the condition of the driver and the passenger. Because a major issue in the case was whether Jennifer Biscan should have observed visible signs of intoxication in Hughes Brown, these witnesses were asked various questions about Mr. Brown's demeanor after the accident.

On appeal, Mr. Brown asserts that, over objection, the trial court improperly allowed testimony by these various individuals that after the accident Mr. Brown appeared unconcerned with the condition of Jennifer Biscan. In his brief, Mr. Brown points us to only one example of the testimony complained of. The witness was, at the time of the wreck, a volunteer paramedic with the Williamson County Rescue Squad. Because part of his role was to check the medical condition of the driver, Hughes Brown, and to look for signs of a head injury, this witness was questioned thoroughly about his interaction with Mr. Brown, Mr. Brown's appearance, and his demeanor. As part of the direct examination by the Biscans' attorney, the witness testified that he asked the driver for the passenger's name and "he would not give me her name." The following examination occurred:

Q. Did he ask you at any point whether she was okay?

A. No, sir.

Q. Did he seem concerned with her at all?

A. No, sir.

Q. What was he doing?

A. He was more worried about his car than he was the - - Jennifer.

42

There was no objection made to these questions or responses. During cross-examination of this witness, Mr. Brown's attorney pursued the following line of questioning:

Q. You just testified that he wouldn't give you the name of his passenger.

A. Yes, sir.

Q. That's a very unusual response, considering the severity of the accident, wouldn't you agree?

A. Yes, sir, I do.

Q. Did he seem to you to be unconcerned with her? That would be a very unusual response, wouldn't it?

A. Yes, sir, it would.

Q. And being concerned about the car rather than his passenger would also be a very unusual response, would it not?

A. Yes, sir, it would.

The cross examination also questioned the witness's ability to remember details of a wreck that occurred four years earlier in view of the number of accidents the witness had been called to. In the portion of the testimony that is the subject of the issue raised on appeal, counsel for the Biscans asked the witness what made this accident stand out in his mind. The witness responded, the reaction of the driver, and when asked why that was, the witness answered, "Appeared to me he had no concern over the passenger." Counsel for Mr. Brown objected to the witness's characterization, and the court overruled the objection. This statement is the sole basis for the contention raised on appeal.

The other emergency personnel who testified earlier in the trial also made statements about Mr. Brown's apparent lack of concern for his passenger. When the first such witness was asked whether Mr. Brown "seemed" to be concerned about Jennifer, counsel objected, and the trial court sustained the objection with the direction that the witness just be asked what Mr. Brown was doing. The witness was later asked, without objection, whether Mr. Brown ever asked how the passenger was and whether he appeared to be paying attention to the girl. Both answers were no. The officer who arrested Mr. Brown that night after investigation and field sobriety tests was also asked, without objection, whether Mr. Brown ever asked him about Jennifer or expressed any concern about her. Again, the answers were no.

This law enforcement officer, on cross-examination by Mr. Brown's counsel, was asked to respond to a hypothetical, the point of which was whether someone could "sober up" quickly in a

situation such as that faced by Mr. Brown, including knowing that his friend was hurt and unconscious. The witness replied:

> Generally, if that were the case, they're usually more hyperactive. He wasn't hyperactive. He was laid back. He was very calm. He was very - - I know he threw it [the beer carton] over to protect himself but that was a calculated move. He didn't do it just because of this adrenaline rush. And as far as their friend was just hurt, he seemed like he was no more concerned about that than whether someone was on the moon.

No objection was interposed to this answer responding to a question asked by Mr. Brown's lawyer.

Thus, there was only one unsustained objection made herein to a witnesses's characterization of Mr. Brown's apparent lack of concern for Jennifer Biscan. This response and the objection were preceded by similar statements made by other witnesses not objected to, and some in response to questioning by Mr. Brown's counsel. Consequently, Mr. Brown waived his right to complain about the admission of those statements. Tenn. R. Evid. 103 (a)(1); Tenn. R. App. P. 36(a). *See also Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 907 n.10 (Tenn. 1006) (stating that "obviously [the complaining party] was required to object to the evidence at the time of its admission in order to preserve its introduction as error"). We cannot see how the admission of the one statement objected to can have had any impact on the outcome of the case in view of the prior testimony. We find this issue to be without merit.

## V. Evidence Related to Damages

Jennifer Biscan suffered severe brain injuries in the accident.[34] When she was taken to the hospital and for a week thereafter, medical personnel did not believe she would survive her injuries. She remained in a coma for over two and a half weeks. She went through months of rehabilitation. It was a month after the wreck before she could respond to simple commands. For almost two months she could not speak.

The medical proof at trial showed that Jennifer remains permanently impaired as a result of the injuries she sustained in the accident. She remains cognitively impaired and has emotional control difficulties associated with severe brain injury. She is functioning at the emotional level of a nine year old. She also suffers from depression and anxiety. Her memory, concentration, and decision-making abilities are impaired. She has difficulty with new learning, planning, judgment, social situations, attention, and impulsivity. She also has weakness in her arms, speech problems, memory problems, sleep difficulties, and double vision.

---

[34]There was bleeding and swelling between her skull and her brain. There was bleeding and bruising in both frontal lobes of her brain, tearing in the corpus callosum, and bleeding in the thalmus. There were also multiple shear injuries throughout her brain and a brain stem injury.

Because of these conditions, Jennifer remains on a regimen of medication; she will need to see a psychiatrist for the rest of her life; will continue to have difficulty with her left arm; and will likely need a caretaker after her parents can no longer take care of her.

Jennifer missed a year of school, but then returned and graduated from high school. She has taken courses at college, where special accommodations and her hard work and efforts have resulted in good grades. Her professors testified, however, that she will have increasing difficulty as she moves beyond introductory courses. Her employment opportunities are also limited.

Jennifer testified that she lives her life like a fairly normal teenager.[35] She stated that her grades are good, that she has a driver's license and drives, and that she has been on trips. She testified that since the accident, she is more determined, more achievement oriented, happier, and a better person.

After hearing all the evidence, the jury awarded a verdict of $3,954,810,[36] comprised of $1,000,000 for lost earning capacity, $650,000 for future medical care, $400,000 for past pain and suffering, $1,500,000 for permanent impairment; and $204,810 for past medical expenses. The jury did not award damages for past or future loss of enjoyment of life.

The defendants do not directly challenge the amount of the verdict or the bases for it. However, they raise two evidentiary issues that are related to the proof of damages. We must presume that their position is that if the evidentiary rulings had been otherwise, the jury would not have awarded the amount in damages.

A. Jennifer Biscan's Consumption of Alcohol Subsequent to the Accident

The Biscans also filed a motion *in limine* seeking to prohibit any testimony regarding Jennifer Biscan's consumption of alcohol at any time after the night of the car accident as irrelevant, unfairly prejudicial, and confusing and misleading to the jury.

At the hearing on the motion *in limine*, the argument centered around the fact that there was contradictory testimony regarding Jennifer Biscan's alcohol consumption after the accident. Jennifer Biscan admitted that on one occasion after the wreck, she had consumed alcohol, but not to the point of intoxication. Amy Grant,[37] on the other hand, was predicted to testify that she had seen Jennifer Biscan consume alcohol on two occasions after the wreck. The defendants also sought to introduce

---

[35]Jennifer was excluded from the courtroom during the medical testimony relating to her prognosis. Her counsel made this request so that she would not be deterred from effort at and expectation of improvement.

[36]As explained earlier, the jury apportioned 15% of the fault for her injuries to Jennifer Biscan, thereby reducing the award to her by that amount.

[37]Amy Grant was the current girlfriend of Jennifer Biscan's ex-boyfriend and her proffered testimony was that on one occasion she observed Jennifer Biscan "sip" beer from a bottle "maybe five times" over less than an hour.

the testimony of Ashley Worley, daughter of Mr. Worley, that she saw Jennifer Biscan take a drink of what appeared to be champagne at a prom party.

After hearing the arguments, the trial court determined that Jennifer Biscan could be questioned regarding her alcohol consumption following the accident "if a foundation was laid with medical witnesses that occasional drinking has already affected her recovery or prognosis because of interaction with Jennifer Biscan's medications." The trial court further held that "Defendants may not offer any testimony or evidence relating to Jennifer Biscan's post-wreck drinking other than through questioning of Jennifer Biscan, except that Defendants may call Amy Grant to testify at trial for the limited purpose of impeaching Jennifer Biscan's testimony."

The medical testimony at the trial offered by Dr. Cynthia Rector, Jennifer Biscan's treating psychiatrist, showed that as long as the alcohol consumption was not a "whole lot in amount" there would be no long-term effect on Jennifer Biscan's future medical condition or the effectiveness of her medication. As a result of the evidence provided at trial, the court excluded testimony regarding Jennifer Biscan's consumption of alcohol subsequent to the wreck because the proper foundation was not laid.

On appeal, the defendants argue that the trial court erred by refusing to allow them "to fully explore the dangers associated with Jennifer Biscan's consumption of alcohol while taking psychiatric prescription medications . . . after the accident." They assert that the evidence that she consumed alcohol against the advice of her doctors and her parents was relevant to her claim for loss of enjoyment of life. Since the jury awarded no damages for loss of enjoyment of life, this argument is moot. They also assert that the use of alcohol "could well aggravate and compound" her injuries. That is exactly the evidence that the court required to be presented before the proffered evidence would be admitted. Defendants never presented proof of a connection between occasional consumption of a small amount of alcohol and any adverse impact on Jennifer's recovery or prognosis.

As stated previously, Tenn. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In light of the medical testimony that small amounts of alcohol would have no effect on Jennifer Biscan's recovery or prognosis, testimony that she consumed a small amount of alcohol on two separate occasions would have no "consequence to the determination" of the damages. We agree with the trial court that the evidence was not relevant and, therefore, properly excluded. The trial court's decision to grant the motion *in limine* regarding alcohol consumption subsequent to the wreck is affirmed.

### B. Testimony of Dr. Netterville

At trial, the jury heard the testimony of Dr. James Netterville, Jennifer Biscan's longtime pediatrician. He is a board certified pediatrician who had treated thousands of children during his tenure as a physician. Dr. Netterville testified extensively about his treatment of Jennifer Biscan

prior to the accident. He was called on the night of the accident, and went almost immediately to the hospital, where he stayed the night with Mr. and Mrs. Biscan, monitoring Jennifer's progress. After Jennifer's first night in the hospital, Dr. Netterville continued to monitor her progress by making regular visits, reviewing her charts, and talking to her treating physicians. He continued to monitor her progress closely after her transfer to the rehabilitation facility and until she was released from that facility. After that time, he saw Jennifer on a regular basis at the Maryland Farms YMCA, where both she and Dr. Netterville exercised on a regular basis, where he questioned her about her progress and observed her recovery.

Prior to trial, Mr. Brown filed a motion *in limine* seeking to exclude the testimony of Dr. Netterville on the basis that he had not treated or examined Jennifer Biscan since the accident, although he had seen her in what Mr. Brown described as a social setting. Citing no particular rule of evidence which would exclude Dr. Netterville's testimony, Mr. Brown relied on *Porter v. Green*, 745 S.W.2d 874 (Tenn. Ct. App. 1987). In *Porter*, this court determined that the opinion of a physician testifying about medically related issues must be reasonably certain, both as to the cause of the physical condition and its future effect. Mr. Brown argued that Dr. Netterville could not possibly testify with reasonable medical certainty as to what the future holds for Jennifer Biscan because he has not treated her professionally since the accident. With regard to the motion *in limine*, the court determined:

> It depends on what the testimony is. If he can cognitively testify as to some things that he observes as a doctor, then I'm gong to let him testify to that. Otherwise, I'll instruct him that the remainder is personal opinions, after [the rehabilitation facility], when he saw her after Stallworth. Before then, I think it was strictly professional.

The trial court granted the motion *in limine* to preclude Dr. Netterville from testifying as an expert as to future effects of Jennifer Biscan's injuries. However, the trial court determined that Dr. Netterville could testify as to Jennifer Biscan's past and current medical condition, the nature, extent, and permanency of her injuries, and the current impairment she was experiencing as a result of her injuries.

On appeal, Mr. Brown complains that the trial court permitted Dr. Netterville to testify "at length as to Jennifer Biscan's medical treatment as well as offer numerous professional opinions." In addition, he particularly cites as error the trial court's overruling of his objection to Dr. Netterville's testimony that although Jennifer's condition was incrementally better than a year ago, "that improvement is going to slow and slow and stop." The primary basis for the assertion of error is that the trial court allowed Dr. Netterville to testify as to areas outside his medical expertise, in part because he had not professionally treated her since before the accident.

Witnesses "should be permitted to give expert opinions . . . [regarding the particular subject at issue] if they possess scientific, technical, or other specialized knowledge derived from their knowledge, skill, experience, training, or education that will substantially assist the trial of fact to understand the evidence or to determine a fact in issue." *Martin v. Sizemore*, 78 S.W.3d 249, 275

(Tenn. Ct. App. 2001). Further, "Testimony of a physician as to the probable effect of the injury is admissible, but it should show that such result is reasonably certain and not a mere likelihood or possibility." *Porter*, 745 S.W.2d at 877, quoting *Reserve Life Ins. co. v. Whittemore*, 59 Tenn. App. 495, 512-13, 442 S.W.2d 266, 274 (1969).

Dr. Netterville was able to testify to Jennifer Biscan's condition both prior to and after the accident; he was the only medical expert who had such personal knowledge. With regard to the brief reference to her future improvement cited above, there is no indication in the record that a trained and experienced pediatrician would not be competent to make that determination. In any event, we find no abuse of discretion in the trial court's ruling.

A number of other medical witnesses testified as to Jennifer's injuries, condition, and prognosis for recovery, including the head pediatric rehabilitation at Stallworth, Jennifer's treating psychiatrist, her treating psychologist, and an expert on neuropsychology. The defendants have not challenged this testimony regarding the seriousness and extent of Jennifer's injuries and her prognosis. Thus, even if part of Dr. Netterville's testimony was inadmissible, it is highly unlikely that exclusion of that evidence would have affected the outcome of the case or the amount of damages awarded.

## VI. Conclusion

For the foregoing reasons, we affirm the decision of the trial court and remand the case for any further proceedings which may be necessary. The costs of the appeal are taxed equally to Paul Worley and Franklin Hughes Brown.

_____
PATRICIA J. COTTRELL, JUDGE